No. 1398.—ERASTUS F. CHANDLER AND AUGUTUS B. CHANDLER *v.* ANTHONY BARRETT, Executor.

The rule that testaments are more easily avoided than contracts, on the ground of mental unsoundness, does not refer to the amount of intellect required in a testator. So far as the latter is concerned, a will may be made by any mind which has the soundness and strength necessary to endure the conflict involved in the making of a bargain.

Insanity is never presumed.

If a testament present a series of wise and judicious dispositions, the *onus* is upon the heirs who attack it to prove unsoundness of mind at the date of its execution.

If by facts occurring near the time of the date of the testament and preceding and following it, the heirs have proved an habitual state of insanity, then, and notwithstanding the wisdom of the will, the *onus* would be shifted on the legatee to prove the sanity of the testator during the intermediate time, that is, at the date of the testament.

If, however, no habitual state of instanity is established, and the acts of folly are rare, and occur at periods distant from each other and from the date of the testament, the testament, if not destitute of good sense on its face, will be presumed to be the offspring of a healthy volition and a lucid memory.

The opinions of medical men are received upon questions of professional skill; but they should state the facts on which such opinions are based, and the opinions themselves are not conclusive but must be weighed as other evidence.

APPEAL from the Second District Court of New Orleans, *Theard*, J. Fourth District Court, presiding. *J. P. Boyd* and *M. O. Dunn* for plaintiff and appellees, *Alex. T. Steele*, for defendant and appellant.

Howe, J. The plaintiffs in this case allege that they, together with a minor brother and minor sisters, are the sole heirs of Mrs. Christina Chandler, their father's sister, who died in New Orleans on the second of August, 1866. That on the twenty-fourth day of July, 1866, the deceased executed an instrument called and known as her last will and testament before A. Hero, Jr., notary, by which she bequeathed all her property to the defendant Barrett, constituting him universal legatee and sole executor; that the will has been admitted to probate upon application of the defendant, but that it is null and void for the reasons that at the time of making the will, and for many years prior thereto, the testatrix was totally disqualified and incapable of making a will; and also for other reasons, which having been abandoned by plaintiffs it is unnecessary to discuss. They pray that the will may be annulled and avoided, and that the plaintiffs with their minor brother and sisters may be adjudged to be entitled to inherit and possess the estate, and for general relief.

The defendant pleads the general denial; especially denies the relationship of plantiffs' father; avers that the testatrix, "Christina Chandler, at the age of seventy years lived alone, uncared for and neglected by the plaintiffs who lived very near to her," and asserts that the deceased "when she made her will and until her death exhibited more than ordinary proof of sanity and capacity to do business."

There was judgment for plaintiffs and the defendant has appealed.

The only question in the case, in the view we have taken of it, is, whether Christina Chandler, on the twenty-fourth day of July, 1866, had testamentary capacity, or whether on the contrary she was intestable by reason of unsound mind? The question, we must say, is not very clearly presented by the pleadings, but it seems from the whole record to have been the main point at issue. And here we may remark that, while it is true as stated by this court in Aubert v. Aubert, 6 Ann. 106, and urged by plaintiffs at bar, that testaments are more easily avoided than contracts on the ground of unsoundness of mind, yet this distinction applies to such matters as those of notoriety and interdiction and not to the amount of intellect required in a testator. So far as the latter is concerned, a will may well be made by any mind which has the soundness and strength necessary to endure the conflict involved in the making of a bargain. It would be unreasonable to require that a testator should have more mental vigor and a more lucid memory than a person who makes a contract. (See Merlin, *Repertoire*, vol. 13, page 550; Stevens v. Van Cleve, 4 Wash. C. C. R. page 267; Converse v. Converse, 21 Vermont 168.

It appears from the evidence that Christina Chandler resided in Missouri in 1825; that her husband died in that year; that soon after his death she became the mother of a son Thomas W. Chandler; that in 1835 she removed to Vicksburg, where she remained until about

1850; that she then came to New Orleans and lived here with her son up to the time of his death in April, 1865; and that she survived him about sixteen months, managing his succession of which she was sole heir, and living alone in the same house in Canal street where she had lived for some time before. In considering the question of her alleged unsoundness of mind at the time her will was made there are some elementary principles which may guide us to a just conclusion. "The Roman law," says Com. Delisle (*Donations et Testamens*, page 82), "furnished rules on this point which still deserve to be followed. If the testament present but a series of wise and judicious dispositions, it is for the heirs who attack it to prove unsoundness of mind at the date of the testament. If it contain dispositions such as would cause insanity to be presumed, although susceptible of being justified by peculiar circumstances, it is for the legatee to prove by witnesses the sanity of the testator as against the terms of the testament. But if by facts occurring near the time of the date of the testament, and preceding and following it, the heirs have proved an *habitual state of insanity*, we are constrained to think that then, and notwithstanding the wisdom of the act, the legatee should be held to prove the existence of soundness of mind during the intermediate time. If, however, the acts of insanity were rare and occurred at periods distant from each other and from the date of the testament, the testament would sustain itself, and would be presumed to have been made in a lucid interval, at least *if the act was not destitute of good sense and betrayed no insanity.*"

"The presumption," says Toullier, "is always in favor of the act. Insanity is never presumed. The advanced age of the donor, the forgetfulness of his family, the largeness of the legacy, the low rank of the legatee, will not of themselves suffice to decide that the testator is not of sound mind." Droit Civil, vol. 3, p. 44. See also Marcade, vol. 3, p. 403, Duranton, vol. 8, p. 167.

"The presumption of sanity does not cease," says Troplong, "because the testator has experienced some transitory intellectual derangement at a time anterior to the testament." Donations et Testamens, vol. 2, p. 56. And the same writer animadverts with characteristic energy upon the tendency he has observed "to transform a morbid susceptibility, an ephemeral, excessive excitement, a superficial trouble, into one of those profound alterations which destroy the reason."

The English law seems to be the same upon these points. In the case of Chambers v. The Queen's Proctor (2 Curteis 415, cited by Ray, p. 272, and Jarman on Wills, vol. 1, p. 72), the deceased was an attorney who made his will on the fifteenth November, 1839, and committed suicide the next day. He labored under singular delusions, having no foundation in truth, on the three days next preceding the day on which the will was executed; among others that the benches of the Inns Temple were about to disbar him on account of an imaginary trivial

fraud he had practiced on them, and that in consequence thereof he was a lost man and must be got out of the country. It appeared that delusions equally gross possessed his mind in 1838. But the court (Sir Herbert Jenner) said that the first point to be considered was whether *habitual* insanity had been proved, "because it is admitted that where habitual insanity does not exist the proof of actual insanity *at the time* the will was made must come from those who impeach the act. The court, therefore, must look for proof of habitual insanity or insane delusion from those who oppose this will;" there being no evidence of actual insanity at the moment the will was made, the court was of opinion that no habitual insanity had been proved, and the will was therefore sustained. (See also Fulleck *v.* Allison, 3 Hazzard 527.

In the common law States of our own country, the same general rules have been laid down. Clark *v.* Fisher, 1 Paige 174; Jackson *v.* Van Deusen, 5 Johnson 144; Halley *v.* Webster, 21 Maine 461.

Turning to the evidence in the record we find the principal acts of folly relied upon by plaintiffs to be that about the year 1850 or 1851, the testatrix, Christina Chandler, ran up on the roof of a house as if trying to escape from an imaginary robber; that about 1856 she had a delusion that her brother had killed seven men and cut them up and thrown them in a well; that "some time before the war" she took all her bed clothing and her clothes and burned them; that about 1863 she informed one of the witnesses that her son and a young lady had bought a large kettle and she believed it was their purpose to boil her up in it; that during the last illness of her son, about sixteen months before her own death, she was very miserly in her housekeeping, to his discomfort; that about two weeks before her death she offered to will her property to a neighbor, Mrs' Hannegan, if the latter would attend to her wants in the way of nursing, and afterwards offered to will it to Mr. Hefferon, another neighbor, if he would go in and take care of her during her last illness; that on another occasion, the date of which is not fixed, she had a fear of being poisoned by her son, and refused for a time to drink water from his cistern; that her habits were those of a miser, and that she was afraid of being cheated and robbed; that some time prior to September, 1861, calling at the house of the plaintiffs' father, Maryland K. Chandler, she would say when she came to the gate, "Maryland, will you kill me?" and he would jokingly reply "yes," and she would then call the witness her sister-in-law.

The plaintiffs also rely on the opinions of experts, but the experts do not seem to agree as to what was the character of Mrs. Chandler's mental aberration. They do not appear to have considered her imbecile nor afflicted with dementia. In their opinion the unsoundness took the form of mania of some kind. The judge of the court who recused himself and was called as a witness, thought her of unsound mind; that she seemed to distrust everybody except the Judge of the Second District Court, to have a morbid fear of being robbed and cheated, and to have "a mania for penurious conduct." He thought, however, that

she knew how to keep her money, that she was not violent, and he did not deem it his duty to interdict her. He did not see her after 1865. The first medical witness thought her insane and seemed to lay much stress upon the delusion in 1863, in regard to her son, and her manner at that time, and her conduct when her son was ill in April 1865. He did not see her for about six months prior to her death except as he saw her passing in the street. The second medical witness declared that she "was afflicted with what is called moral insanity, which is characterized by cruelty to one's kindred." He did not see her after April, 1865.

We may here observe that while it is true that experts may give opinions, and that the opinions of medical men are freely received upon questions of professional skill, it is equally true that they ought also to state the facts on which those opinions are based, and that the opinions themselves are not conclusive, but must be weighed as other evidence. 5 La. 276; 4 Ann. 377; 1 Jarman on Wills 78.

We have given a careful consideration to the testimony of these experts, and are constrained to think that no habitual state of insanity has been established by it. Nor do we think the other witnesses have established such a state. Penuriousness or miserly conduct is hardly evidence of such a condition. The desire of the deceased to leave her property to her neighbors, provided they would nurse her in her last hours, seems to have been an effort to attract a kindly attention, and we might adopt in this regard the language of Chancellor Kent, and say: "It is one of the painful consequences of extreme old age that it ceases to excite interest, and is apt to be left solitary and neglected. The control which the law still gives to a man over the disposal of his property is one of the most efficient means which he has in protracted life to command the attentions due to his infirmities." Van Alst v. Hunter, 5 John. ch. 148.

The fear which Mrs. Chandler had of being robbed and cheated, we do not think unnatural in an aged woman who appears for upwards of a year before her death to have lived alone unvisited by a single one of her relatives. The plaintiffs and their mother do not seem to have seen her since 1861; although for the greater portion of the time from 1861 to 1866, they resided within three miles of her house. From the squalid style in which she lived it is as likely that the burning of bed clothing and clothes "some time before the war," that is at least six years before the will was made, was a sanitary precaution as that it was the act of a lunatic, and even if it was an act of Pyromania, it was never repeated in any form.

As for the delusions which perplexed her mind at different times during a period of sixteen years, it is to be observed that they were few in number, were not permanent in their character, and were separated from each other and from the date of the testament by long periods of

Erastus F. Chandler and Augustus B. Chandler v. Anthony Barrett, Executor.

time. They were undoubtedly morbid, and we may presume they indicated cerebral irritation at the time they appeared, but we find no trace of them in the evidence after the year 1863, and the will was made in 1866.

We are of opinion, therefore, that the plaintiffs have not overcome the presumption of sanity which must exist in favor of a will so rational as that of the testatrix in this case; and we are confirmed in this opinion by the testimony for the defense. We there find Mrs. Chandler, four weeks before her death, consulting a lawyer in regard to a suit which had been brought against her, and stating the facts to him with clearness and accuracy. Two days after she calls again upon her counsel, informs him correctly of her family relations, of the fact that she has no descendants, and states her desire to make a will so as to dispose of her property as she pleased. She mentions the fact that she knows Mr. Hero, and is advised to employ him as notary. On the day the will was made, Mr. Hero with these witnesses went to her house. She told him she desired him to make her last will and testament; she dictated to him the ideas as written down in the will; she told him that no one had taken care of her (meaning; doubtless, no one whose natural duty it was to care for her); that Mr. Barrett had, and would continue to do so. She then informed the notary that she had some money in the house, gold coin, which she did not wish to keep there as she had some time before been robbed of her paper money. She then went, with assistance, into the next room and brought a basket containing six or seven rolls of paper, in each of which she said there were one hundred dollars, except one which contained sixty dollars. The money was counted by the notary, and, as he says, proved to be in amount what she had stated. The money was then handed to Mr. Barrett for safe keeping, apparently, as she did not wish to keep it "there." She then told the notary that Mr. Barrett had constructed a tomb for her in one of the cemeteries (a fact elsewhere appearing in the evidence). and that as part of the consideration of his services, she desired to transfer to him certain vaults she owned, and the written transfer was thereupon made. The plaintiffs urge that this was an act of insane folly, inasmuch as she had given him already over six hundred dollars, gold, and had bequeathed him all her property; but we cannot so regard it. She had given him the gold for safe keeping, and as for the rest of her property it was uncertain when she would die, the defendant might not have come into possession for years, she might have used it up as well as the gold before her death, or she might have revoked her will. We think the act quite business like. The notary and the witnesses were in her presence about two hours. She seemed a very avaricious woman, who deprived herself of all the luxuries and many of what are generally considered the necessities of life, but to all of these four witnesses she seemed to be perfectly rational and to have an excellent memory. Her capacity for business, her determined

frugality, her knowledge of her property and of her legal rights, her prudent administration of her son's estate for fifteen months prior to the date of the testament, appear elsewhere in the evidence both for plaintiffs and defendant. That she was very penurious and very eccentric is plain enough, but that she was habitually insane is something we cannot affirm. She had in former years, without doubt, on occasions separated by long intervals of time, suffered from irritation. of the brain, but from the evidence we must deem it to have been of the transitory kind, which occurring long anterior to the time of the testament, does not cause the presumption of sanity as to that act to cease. If the plaintiffs had shown that before these isolated acts of folly occurred her habits of mind were different, and that these acts indicated a permanent and morbid change, if they had shown that the delusions which visited her at various times continued to manifest themselves in some form down to the time she made her will, as if the result of a chronic state, in short if they had brought themselves within the rule that where the insanity is proved to have been habitual, the burden of proof is shifted on the legatee, the result might have been different. But as the case comes to us, it seems to fall under the rule we have cited, that if the acts of insanity are rare and occur at periods distant from each other and from the date of the testament, the testament, if not destitute of good sense, and betraying no folly on its face, will sustain itself to be presumed to have been the offspring of a healthy volition and a lucid memory.

For the reasons given it is ordered and adjudged that the judgment appealed from be reversed and avoided, and that there be judgment in favor of defendant with costs in both courts.

Rehearing refused.