114   506
s117   544
s117   547

(38 South. 435.)

No. 15,415.

Succession of MORÈRE.

(March 27, 1905.)

#### WILL—TESTAMENTARY CAPACITY.

Where it is shown that the testator was habitually insane before, about the time of, and after the making of the will, the burden of proving his sanity at the moment of the making rests upon those who seek to maintain the validity of the will, and in such case this burden is not shifted by reason of the fact that the expressions and dispositions of the will are intelligent and judicious, unless it be also shown affirmatively that the will was made or dictated by the testator himself, unaided and uncontrolled.

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; John St. Paul, Judge.

In the matter of the succession of Pierre Morère. From a judgment rendered at the instance of the widow in community, Bartholemew Morère, testamentary executor, appeals. Affirmed.

Henry Denis, for appellant. Robert John Maloney, for appellee.

### Statement.

MONROE, J. Bartholemew Morère, testamentary executor, appeals from a judgment rendered, at the instance of the widow in community, annulling the last will of Pierre Morère. The facts disclosed by the record are as follows:

Pierre Morère, with his wife and two minor children, lived in that part of New Orleans known as "Carrollton," where he was engaged in business with his brother Francis Morère. As early as 1898 he exhibited symptoms of melancholia, and the progress of the disease was such that in the summer of 1900 his insanity may be said to have become notorious; and, as about the last of many suggestions offered for his benefit, he was accompanied during that season by a friend upon a.trip to the West, from which he returned, after an absence of a few weeks, in a worse condition than when he left home. On October 30, 1900, no steps for his interdiction having been taken, a business settlement, whereby he agreed, upon certain terms, to sell his interest in the firm of F. Morère & Bro., was effected between him and his brother Francis. Early in November, in the middle of the night, the decedent's insane ill treatment of his wife culminated in a violent attack, in which he dragged her about the floor and choked and beat her, so that, being confined to bed, she sent for the family physician and for Francis Morère, and, after informing them of the situation, took refuge, with her children, at the house of her mother. Upon November 8th, Dr. Dorrestein, who had treated the decedent at intervals since 1898, certified that he had been insane for a year or more, and that he was becoming more violent, and should be restrained, and Dr. Henry, a reputable physician, living in Carrollton, certified that he had been for some months mentally affected,

and that his malady was assuming a violent form, and demanded serious attention. On November 12th Pierre Morère turned over to· his brother Bartholemew $7,200, with the request that it be kept for his children, and,. upon the same day, accompanied by both brothers, he proceeded to the office of Mr.. G. V. Soniat, attorney at law, and there executed the olographic will which is here attacked, and which reads as follows, to wit:

"New Orleans November 12, 1900

"I leave all I die possessed of to my two children, Cora and Simon Pierre, Morère, hereby constituting them my universal legatees. I hereby name my brother, Bartholemew Morère, the testamentary executor of this, my last, will. and testament. [Signed] Pierre Morère."

Four days later, on November 16th, Francis Morère having obtained, as of that date, from Drs. Dorrestein and Henry, certificates. to the effect that the testator was insane and dangerous, took him· to the Louisiana Retreat, an asylum for the insane, and there incarcerated him, following which, on November 19th, he brought suit for interdiction, alleging inter alia that his brother, Pierre Morère "was subject to an habitual state of imbecility or madness, and that he [was] is incapable of taking care of his person and of administering his estate." For the purposes of the suit so brought, Drs. Archinard and Theard were appointed by the court to· examine the proposed interdict, and, having done so, they reported that he was insane, "a sufferer from dementia, without hope of betterment, and unable to properly manage either himself or his own affairs." Upon the information thus obtained, supported by oral testimony, including that of Bartholemew Morère, in January, 1901, judgment of interdiction was rendered, whereupon, the widow,. having been appointed curatrix, brought suit against Francis Morère to annul the alleged settlement between him and the insane man, and proceeded by rule against Bartholemew to recover the $7,200 which had been placed in his hands, and judgments were rendered

against both defendants as prayed for. The interdict remained in the asylum from the day of his incarceration until April 19, 1903, when he died. On April 28, 1903, the will in question, which from the date of its execution had remained in the custody of Bartholemew Morère, and, of the existence of which the widow was not informed, was offered for probate, and, upon the testimony of Bartholemew Morère and of Mr. Soniat to the effect that it had been entirely written, dated, and signed by the testator, was ordered to be executed. An inventory, to which the widow was a party, was accordingly taken, and letters testamentary were issued.

On June 20th the executor filed his account; on June 30th the widow received letters of tutorship; and on July 2d, in her individual capacity and as tutrix, she instituted this suit to annul the will, which proceeding was followed on July 7th by an opposition to the executor's account. The grounds upon which the will is attacked are that it is not in the handwriting of the decedent, and that at the time of its alleged execution the decedent was incapable, by reason of insanity, and to the knowledge of the executor, of making a will.

The executor excepted to the action of nullity on the grounds that the interest of the plaintiff was in conflict with that of her wards, and that she is estopped to attack the will by reason of her having participated in the taking of the inventory, and having thereby recognized the capacity of the executor. The first exception was maintained, in so far as that the undertutor of the minors was directed to be made a party to the proceedings. The second one was overruled. The executor then answered, affirming the validity of the will.

Upon the trial of the case, Francis Morère testified that his brother Pierre was sane up to the day preceding his incarceration in the asylum, and that until then he had never heard anything to the contrary. And Bartholemew testified that he never knew or heard that Pierre's mind was affected until he learned that he had been sent to the asylum. It is, however, conclusively established that the insanity existed, was notorious in Carrollton, and was known to both the witnesses long before the date mentioned by them. Thus we find the following in the cross-examination of Francis Morère, to wit:

"Q. Mr. Morère, your brother Bartholemew, in the testimony given in the interdiction proceeding * * * (the whole record in which suit is offered in evidence by the plaintiff), says as follows: 'If you had been called upon to go into any business transactions with him, would you have thought it safe and proper to do so?' The answer was: 'I would not.' The next question was: 'Why would you not have gone into business transactions with him?' and the answer was: 'From the way he carried on, I thought he was getting unbalanced.' The next question was: 'You stated you had frequent interviews with your brother from the 1st of October up to the time of his interdiction. What was the condition of his mind during that interval? Do you think he was off?' The answer was: 'Of course, I am not a physician, but I think he was unbalanced.' Now, Mr. Morère, would you agree with your brother Bartholemew's testimony in that respect, as given in case No. 63,558, and sworn to before Wm. R. Ker, notary public, on the 2d day of May, 1901? Would you agree with that testimony, or would you disagree? A. I think I would be willing to go into anything with him."

It is true that the record in the interdiction proceeding, though offered in evidence, does not appear in the transcript before us; but, as no objection was made to the questions propounded, we think it fair to assume that the testimony attributed to Bartholemew Morère was actually given by him. As to Francis Morère, Dr. Dorrestein testifies that he spoke to him about his brother's insanity in the spring of 1900; and Francis himself, in his petition for interdiction, alleged that it was habitual, and it is otherwise proved that it was notorious in Carrollton. Bartholemew Morère, referring to the meeting of his brother and himself with Pierre upon the day upon which the will was made, and to the will, testifies in part as follows:

"I don't know how we came to meet him on that day. We met him on Royal street, and he said to come with him; that he wanted to make a will. Q. Where did you go? A. To Mr. Gustave Soniat's office. * * * Q. What did Mr. Soniat say to him? A. Mr. Soniat asked him if he wanted to write it himself. They were speaking of some kind of a will to be made by Mr. Morère himself. I don't know what kind of a will it was. He asked Mr. Soniat what should he put down, and Mr. Soniat then told him how to make the will. Q. Did he then make it under the direction of Mr. Soniat? A. Yes; he made it under the direction of Mr. Soniat. * * * Q. Now, Mr. Morère, on the day that your brother Pierre made his will, did he put anything in your hands besides that will? A. Well, I had $7,200 that I put away for him. Q. He actually put in your hands $7,200? A. Yes, sir. Q. In what shape? A. I don't know —it has been so long—I don't remember whether or not it was a check or cash money. I can't remember that, but I put it in the bank. Q. What did he tell you he put that money in your hands for? A. To put away for his children."

Francis Morère, referring to the making of the will, gives the following testimony:

"Q. Did your brother write this will? A. Yes, sir; he wrote it. Q. From his own dictation, or from some one else's dictation? A. No, sir; Mr. Soniat spoke the words out, and he wrote them down. Q. In other words, Mr. Gustave Soniat stood over him and spoke the words to him, and, as he spoke them, your brother wrote them down? A. Yes, sir."

Mr. Soniat had departed this life before the trial in the lower court, and, whilst the fact that he testified in the probate proceedings that the will was written, dated, and signed by the testator leaves no doubt upon the subject, there is testimony in the record which suggests a very grave doubt as to whether the proceedings were or could have been conducted in the manner stated by Francis and Bartholemew Morère, since it appears that the testator was a man of very limited education, and it seems hardly probable that he would have been able to write the will which has been probated unless the spelling as well as the words was dictated, or unless he copied it from a form prepared by some one else.

Dr. Dorrestein, who, as we have stated, treated the testator at intervals from 1898, and who, four days before and four days after, his incarceration in the asylum, certified to his insanity, testifies that he was suffering from that form of insanity known as melancholia, which, though sometimes curable, in his case grew progressively worse until in November, 1900, it had assumed the form of secondary or chronic dementia, and that there was never any evidence of recovery.

Dr. Archinard, an expert witness, who examined the testator, by appointment of the district court, in December, 1900, testifies that there may be lucid intervals in melancholia, but he further testifies that it is only when the lucid interval lasts long enough to amount to a temporary cure that the patient can be regarded as an intelligent and responsible being; that he found the patient suffering from chronic dementia, for which there is no cure; and that, whilst he is unable to say, positively, he believes that he had been so suffering for more than six weeks.

Dr. Theard, also an expert, who acted with Dr. Archinard, testifies to much the same effect, and expresses the opinion that the dementia had existed for "a period of months, at least." From the testimony of all the witnesses, expert and nonexpert, we conclude that for more than a year prior to the date of the making of the will in question the testator was afflicted with melancholia, which in his case was progressive, and, as it turned out, incurable, and which culminated in the secondary or chronic dementia of which he eventually died; that chronic dementia is usually the ending of all forms of insanity, and is ordinarily incurable, admitting of no lucid interval, no sequence of ideas, and no discriminating thought.

### Opinion.

The rule of the civil law applicable to the question here presented has been stated by our predecessors in this court as follows:

"A lucid interval, under the civil law, is not an apparent tranquility or seeming repose. It is not a simple diminution or remission of the disease, but a temporary cure—an intermission so clearly marked that it perfectly resembles a return to health; and, as the nature of the interval cannot be ascertained in an instant, it must continue during a length of time sufficient to give the certainty of the temporary return to reason. The time must in all cases be considerable. * * * The Roman jurisconsults distinguished two classes of insane persons. One class they called 'furiosos'; the other, 'mente captos.' * * * All the Roman laws which speak of lucid intervals have exclusive reference to the first class. For instance, the law 39, Digest de Judiciis, authorized the insane of the first class to discharge judicial functions during lucid intervals. But this was never permitted in cases of simple insanity." Aubert v. Aubert, 6 La. Ann. 108, 109. Quoting from Coin-Delisle, Donations et Testaments, p. 82.

This court in another case has said:

"The Roman law furnished rules on this point which still deserve to be followed. If the testament present but a series of wise and judicious dispositions, it is for the heirs who attack it to prove unsoundness of mind at the date of the testament. If it contain dispositions such as would cause insanity to be presumed, although susceptible of being justified by peculiar circumstances, it is for the legatee to prove the sanity of the testator, as against the terms of the testament. But if, by the facts occurring near the time of the date of the testament, and preceding and following it, the heirs have proved an habitual state of insanity, we are constrained to think that then, and notwithstanding the wisdom of the act, the legatee should be held to prove the existence of soundness of mind during the intermediate time. If, however, the acts of insanity were rare, and occurred at periods distant from each other and from the date of the testament, the testament would sustain itself, and would be presumed to have been made in a lucid interval, at least if the act was not destitute of good sense and betrayed no insanity."

And agreeably to the views so expressed, it was held that if, by facts occurring near the time of the date of the testament, and preceding and following it, the heirs have proved an habitual state of insanity, then, and notwithstanding the wisdom of the will, the onus would be shifted to the legatee to prove the sanity of the testator during the intermediate time; that is, at the date of the testament. Chandler v. Barrett, Ex'r, 21 La. Ann. 58, 99 Am. Dec. 701.

114 La.—17

Neither of these cases deals with the possibility of monomania or partial insanity, as a result of which the mind, whilst habitually incapable of normal action with reference to particular subjects, seems to retain its natural power with respect to all other matters. This question was, however, exhaustively considered in a still more recent case, in which the conclusion reached by the court is thus stated in the opinion of Mr. Justice Fenner, handed down upon the application for rehearing, to wit:

"The fact that a man is subject to disease of the brain is per se no better reason for depriving him of testamentary power than would be his having a disease of the liver. On the contrary, as we have seen, the liability to infirmity, which is the inheritance of man, and the consequent need of care and attention, are amongst the most powerful reasons for testamentary freedom. The real question is whether the brain or other physical organ, whatever it may be, which is the medium through which the action of the mind is manifested, is so diseased or impaired as to make it an untrustworthy vehicle for the conveyance of the true will of the testator, unbiased by any delusion which may be the result of such disease. The law fixes the time for the application of this test at the moment when the will is made, and expressly recognizes the capacity of persons subject at times even to complete dementia, to make a will in lucid intervals. *When the will is established to have been made by the testator himself, unaided by others*, and when its provisions are sage and judicious, containing nothing sounding in folly, these facts establish a presumption, even in the case of persons habitually insane, that it was made during the existence of a lucid interval, and impose upon those who attack the will the burden of proving insanity at the moment when it was made." (Italics by the present writer.) Kingsbury v. Whitaker et al., 32 La. Ann. 1067, 36 Am. Rep. 278; Succession of Bey, 46 La. Ann. 773, 15 South. 297, 24 L. R. A. 577.

It will be seen from the foregoing that the rule as stated in Aubert v. Aubert and Chandler v. Barrett, Ex'r, supra, has been modified to the extent that, even in cases of habitual insanity, if the will, upon its face, appears to be sage and judicious, containing nothing sounding in folly, and it "is established to have been made by the testator himself, unaided by others, the onus of proving the insanity of the testator at the

time of the making still rests upon those who allege it." And this ruling is not affected by that made in Godden v. Burke's Ex'rs, 35 La. Ann. 161, since although it there appears that the testator had been aided in the making of his will, the court concluded, in the first place, that he was not habitually insane, and in the next that he was shown to have been of sound mind when the will was made.

The doctrine of these later cases can, of course, have no application to forms of insanity which admit of no lucid interval, no sequence of ideas, and no discriminating thought. Whether, as seems to have been the view of the court in the Kingsbury case, "complete dementia" is susceptible of lucid intervals, or whether, as the experts appear to have testified, in the Succession of Bey, melancholia is "in its nature incurable, and not susceptible of lucid intervals," we shall not here undertake to determine. The testator in the instant case is conclusively shown, not only by expert opinion, but by proof of facts, to have been afflicted with a mental disease diagnosed by the experts as melancholia, culminating in chronic dementia, which was certainly progressive in character, which incapacitated him for business, which rendered him so dangerous that it became necessary to confine him in an asylum, and from which he subsequently died, utterly demented; and it was whilst he was so afflicted that he made the will in question, not, by himself, unaided by others, but, as it was dictated to him, word by word, and (as must have been the case if the witnesses for the defense are to be believed at all), letter by letter, after he had been accompanied to the office in which it was made by his two brothers, who, in testifying, have shown that they entertain no good feeling towards the widow, to whose prejudice the act was done. The facts of this case do not, therefore, bring it within the modification of the original rule; and, the habitual insanity of the testator having been established, the burden of proving his sanity at the moment of the making of the will rests upon the proponent, the success of whose attempt to make such proof depends upon the value which is to be attributed to his testimony, and to that given by his and the testator's brother, Francis Morère, for, be it observed, the proponent has offered no other witness, save himself and Francis Morère, and no other proof, save their testimony, to show that Pierre Morère was in any other condition at the moment of the making of the will than that in which he is proved to have been before and after that occurrence.

Francis and Bartholemew Morère testify that they did not know that Pierre's mind was affected until about the time or after the former incarcerated him in the asylum, but this testimony is shown to be untrue. Not only was the fact of Pierre's insanity notorious, but Dr. Dorrestein testifies that he discussed it with Francis in the spring of 1900, and Bartholemew himself testified in the interdiction proceeding that he was aware of it, and would not, for that reason, have entered into any business arrangement with Pierre; and this destruction of their testimony as to their ignorance of their brother's mental condition carries with it the destruction of their testimony to the effect that he was sane upon the 12th of November, 1900, when he gave to Bartholemew the sum of $7,200, for which the latter gave no receipt or acknowledgment, and of which he testifies that he is unable to remember whether it was given to him by check "or in cash money," and which was but a few days after Pierre's dangerous insanity had manifested itself in a violent assault on his wife, and had been certified by two reputable physicians, and a few days before his brother Francis placed him in an asylum, where he remained until he died. The proponent of the will therefore fails to prove that it

was made during a lucid interval in the habitual insanity of the testator, and, as we find no merit in the plea of estoppel, the judgment appealed from is affirmed.