ODOM, Justice.
 

 Mrs. Kate Elfa Tyler died December 29, 1936, leaving certain property in New Orleans, which she disposed of — or attempted to dispose of — by last will in holographic form, dated January 27, 1936. The will reads as follows:
 

 “I, Katherine Elfa Tyler, make this my last will and testament. I name Louise Louque Burton my testamentary ' executrix, and ask her to sell all my earthly belongings and to expend the whole amount received therefrom after payment of my debts, in an adequate memorial on cemetery plot, tombstone to be preserved and used in some way, and the name of Josephine Youelle, wife of George Elfa, and the undersigned inscribed thereon, also the name of Amelia Elfa, who is now living.
 

 “Katherine Elfa Tyler”
 

 Some three or four days later, Mrs. Tyler added the following paragraph without signing it:
 

 “Mrs. Burton, I want a thousand dollar casket and so much invested for upkeep and flowers put on tomb on “All Saints Day’.”
 

 This is a suit to annul the will on the ground that, at the time it was made, Mrs. Tyler was insane.
 

 The only question involved is whether or not she was insane on the date the will was made. The trial judge held that she was and set the will aside. The executrix, who had the will probated, appealed.
 

 A detailed statement of the pleadings is set out in our opinion on motion to dismiss the appeal, handed down on Monday, April 3, 1939. 192 La. 365, 188 So. 31.
 

 
 *583
 
 Our reading of the testimony submitted at the trial leaves us in no doubt that Mrs. Tyler was insane on January 27, 1936, when she made her will. She was sent to the City Hospital for Mental Diseases in New Orleans on February 28, 1936, one month and a day after she made her will. That she was then insane, and that she remained so until the date of her death in December following, is not seriously denied by the proponents of the will. Their contention is that, conceding that she was then insane and that she remained so, there is no testimony in the record to show that she was insane when she made the will on January 27.
 

 The will was written in the law office of Mrs. Louise Louque Burton. Mrs. Burton testified that Mrs. Tyler came to her office on the morning of January 27 and told her she wanted to make a will. She handed Mrs. Tyler some paper and a pen, and the will was then and there written. Whether Mrs. Burton furnished her a form for the will is not disclosed. Mrs. Burton said that the testatrix was not nervous and seemed to be perfectly calm at that time. However, her testimony as a whole indicates that she must have been apprehensive at least at the time the will was written that Mrs. Tyler was not of sound mind.
 

 She testified that on February 1, which was four days after the date of the will, she went to see Dr. Cazenavette because
 
 “I
 
 wanted to see if he could help Mrs. Tyler. * * * Because I saw that Mrs. Tyler needed medical attention”. Mrs. Burton was asked on cross-examination, “What special condition was there in this lady that caused you to go to Dr. Cazenavette on February 1st? What special condition impressed you?” She answered: “She was getting thin and she wasn’t eating. I wanted to see if we couldn’t place her in a hospital, or if the Doctor couldn’t get her to calm down and get the proper nourishment and the proper care.”
 

 She further said, “Then her condition was getting worse.”
 

 Speaking of Mrs. Tyler’s condition, Mrs. Burton said: “if she could have gotten ,some rest, I think she would have been all right, but she never got any rest, because she had this terrible grief that her mother was dead [Her mother died December 24, 1935, one month and three days before the will was made.] and she was alone in the world with nobody to do anything for her; and I wanted to see if Dr. Cazenavette wouldn’t come to see her, or she see him.”
 

 Evidently it was not Mrs. Tyler’s physical condition that caused Mrs. Burton’s alarm, because she went to Dr. Cazenavette, who is admitted to be an expert on mental diseases and who was, at the time Mrs. Burton went to see him, connected with the City Hospital for Mental Diseases, the United States Marine Hospital at Carville, Louisiana, as neuropsychiatrist, and with the Charity Hospital as senior visiting neuro-psychiatrist, and with the Tulane Medical School.
 

 Mrs. Burton said, “Mrs. Tyler was getting sick, and I would have liked to
 
 *585
 
 have Dr. Cazenavette take charge of her.” She said she wanted to see “if we couldn’t place her in a hospital”. She evidently meant the Hospital for Mental Diseases. She wanted to see whether Dr. Cazenavette could not get the patient to “calm down”. She further said that Mrs. Tyler threatened to commit suicide. She cut her finger with a safety razor blade and said that she wanted to commit suicide, “yes; I heard her say that”. Asked whether she had ever heard about Mrs. Tyler’s trying to throw herself out of a moving car, Mrs. Burton said, “Well, I don’t know anything about that outside of hearsay.”
 

 Counsel for the proponents of the will say that the condition of the patient four days after the date of the will, as detailed by Mrs. Burton, does not necessarily show that the testatrix was insane when it was made. But we think that her testimony indicates very strongly that the condition in which she found Mrs. Tyler on February 1 was not different from that which had existed for some time. It is hardly probable that Mrs. Tyler’s mind would have deteriorated so rapidly after January 27, if she was then of sound mind, as to convince Mrs. Burton four days later that she was in need of treatment by a psychiatrist. Mrs. Burton says that the testatrix could get no rest because of her great grief, that she would not eat, and could not calm down.
 

 Aside from Mrs. Burton’s testimony, however, there is testimony in the record which shows that Mrs. Tyler was in a serious and pitiable mental plight prior to the date of the will. A copy of the original record made by those in charge of the Hospital for Mental Diseases at the time Mrs. Tyler was admitted was filed in evidence. That record shows that she was admitted "on February 28, 1936, and recites:
 

 “The patient was brought to the Hospital by her Attorney, R. H. Burton and City Police from the 3rd Prect. Station, and was violent and filthy on admission.”
 

 R. H. Burton is an attorney at law, and a son of Mrs. Louise Louque Burton. The reason why Mrs. Tyler- was in charge of the city police and was taken from the Third Precinct Station to the hospital was that she had been committed to that institution by the court on the advice of the coroner.
 

 The hospital record shows that the “informant” was R. H. Burton, attorney, who made the following report concerning Mrs. Tyler’s condition:
 

 “For five or six weeks the patient has continually come to informant’s office repeating the same thing over and over. Wanted him to help her out of her trouble. Complained of her house being awfully dirty; when told to go and clean it up she did not know what to say. She sold some of her furniture and claimed that someone had stolen it. Claimed that the Informant’s aunt had opened up her (patient’s) bank box at the American Bank and had taken all the stocks that were in there. Yesterday the Patient phoned the Informant and his aunt every three minutes all day long, until they dis
 
 *587
 
 connected the phone with a switch. The patient’s mother died last Christmas, she has been living alone since that time. The patient claims that she has heard people coming in her house at night having duplicate keys, and stole all her things. Thought everyone was trying to rob her. It has been reported to Informant that she has pulled everything out of drawers and piled them in the middle of the floor. There were no threats of homicide. She has threatened many times to commit suicide. Threatened to cut her throat. To use gas. A few days ago tried to throw self out of a moving car.”
 

 The testimony of Attorney R. H. Burton was not taken at the trial, but the record contains an admission that, if he were called as a witness, he would testify to the facts reported by him to the hospital authorities when he' carried Mrs. Tyler there on February 28. It will be noted that, according to Mr. Burton’s statement, Mrs. Tyler had been in a serious condition “For five or six weeks”. Therefore, according to his testimony, Mrs. Tyler’s mental faculties must have been seriously impaired at the time of, and prior to, the making of the will.
 

 Dr. Cazenavette testified that Mrs. Burton telephoned him on February 1 that she had a client who was giving her a great deal of trouble — that her client seemed to be “mentally disturbed”; that Mrs. Burton came to his office about February 3 and told him that her client, Mrs. Tyler, “had given her a great deal of trouble, and that she felt that she was mentally disturbed, and she wanted to know what procedure to be taken”. He told Mrs. Burton that two physicians should be appointed to examine Mrs. Tyler and determine her mental state, and he stated that Mrs. Burton had left his office saying that “if the patient was to give her much more trouble, then she would have to place her in the mental hospital”.
 

 Dr. Cazenavette first saw Mrs. Tyler at the Hospital for Mental Diseases on February 29, the day after she was admitted. He said he was informed that she was carried there from the Third Precinct Police Station by Mr. Burton. (The record shows that she was brought there by Mr. Burton and the police.) He examined her and got her history from the statement made by Mr. Burton, from the hospital record, and from Mrs. Keeting, a first cousin of the patient. He said the patient seemed to be poorly nourished and physically depleted; that she was “continually talking, talking continuously. It would be difficult for her to answer any questions that they asked her; she would always ramble in some other direction”. He said his information was that her father died in an insane asylum and that she had an aunt who was insane. His diagnosis was that the patient was suffering from a disease known as schizophrenia, “which is characterized by disorders of feeling and thinking, and the consequent disturbance of the patient’s relation to the outer world”.
 

 From his examination of the patient and from the history which he received, he gave it as his unqualified opinion that Mrs. Tyler’s condition antedated the date of
 
 *589
 
 the will, and that she was mentally deranged and incapable of knowing what she was'doing when she wrote it.
 

 Dr. Philip H. Jones, Jr., who was connected with the City Hospital for Mental Diseases and who examined Mrs. Tyler on the day she was admitted, testified that Mrs. Tyler had been committed to the hospital by the coroner and by the recorder’s court; that she was violent, talking constantly in a confused manner, and that her physical condition was filthy. His diagnosis was schizophrenia. A portion of his testimony is as follows:
 

 “Q. Doctor, if a patient is suffering from schizofrenia, would an apparent remission for an hour or a day indicate that the patient had recovered from the disease, and, during such interval, have testamentary capacity? A. No.
 

 “Q. Can you tell us your reason for such an opinion? A. The disease schizofrenia represents a basic disorder of the mind, and the thinking is so disordered that it is not conceivably possible for the normal mental faculties to return and be stable in so short a time.”
 

 Dr. Clarence P. May, a specialist in nervous and mental disorders, testified as an expert witness, although he had. had no contact with the patient and based his opinions on what he had heard others say and on records of the case. He stated that in his opinion Mrs. Tyler was suffering from a disease called involutional melancholia, that the will itself did not contain anything which would lead him to believe-that its writer was suffering from any mental disorder at the time of making it, and that she “could have had” testamentary capacity.
 

 Mrs. Keeting, a cousin of Mrs. • Tyler, testified that relations had been strained between them and that they had not seen each other for ten years prior to the death of Mrs. Tyler’s mother; that, after her mother’s death, Mrs. Tyler had telephoned her and begged her to come to see her. She stated that she went there early in January, accompanied by her daughter, and that Mrs. Tyler’s conduct and physical appearance indicated that she was mentally deranged. She had a wild look in her eyes, Mrs. Keeting said, and she and her daughter were very frightened by Mrs. Tyler’s appearance and actions. The house was in complete disorder, with clothes, dishes, and the contents of drawers and cabinets heaped about everywhere. Mrs. Tyler, herself, attired in an old, ragged bathrobe, was dirty and unkempt. She spoke of suicide and had a razor lying on the kitchen table. Much against her wish, Mrs. Keeting paid another visit to Mrs. Tyler about the middle of January, since Mrs. Tyler had constantly been telephoning her asking her 'to come. This time her sister, Mrs. Rivas, went with her. According to her testimony, which is corroborated in substance by Mrs. Rivas, Mrs. Tyler was living in the same condition of disorder and misery. She was obsessed with the idea that, people were stealing from her, kept the various rooms of her house locked apart from one another, was’ not attempting to fix food for herself or
 
 *591
 
 for her dog, although there were groceries and canned goods in the house. She begged to be taken home with Mrs. Keeting, and said she would sleep on the bathroom floor if she were allowed to go with her. She said that she wanted to cry but could not, s.nd asked her cousins to cry, since perhaps that would help her to cry.
 

 Both these visits, it will be noted, took place in the month of January, 1936, after the death of Mrs. Tyler’s mother and prior to the date of the will.
 

 Mrs. Burke, a cousin-in-law and neighbor of Mrs. Tyler, testified that she had had daily contacts with Mrs. Tyler from the time of her mother’s death to the time she was committed to the hospital. She found a change in Mrs. Tyler, she said, and noted that she had become unkempt and dirty, and, when told that she should bathe or wash her hands, merely said she “couldn’t”. Mrs. Burke stated that she had not, at the time, believed Mrs. Tyler to be crazy but had thought her to be suffering from a nervous condition brought on by her mother’s death. She constantly begged Mrs. Burke to come to live with her, Mrs. Burke said.
 

 The record shows that, at the time Mrs. Tyler was admitted to the Hospital for Mental Diseases on February 28 and thereafter until her death the following December in the East Louisiana Hospital for Insane at Jackson, Louisiana (to which latter institution she had been transferred on August 21), she was in a pitiable plight mentally — in fact, she was totally insane. She imagined such things as that a black bug was crawling over her body; that the physicians in charge of the hospital and her lawyer had rifled her bank box and appropriated to their use her earthly possessions; she imagined that she could hear people talking about her when in fact no one was near her; that she was in danger of being robbed, and finally conceived the idea that she had been convicted of a capital crime without being represented by counsel; that she had $5,000 for her defense but that the lawyers had used it for other purposes; that all the testimony introduced against her at the trial was circumstantial, and that she had no one at the trial to protect her. On May 1 she wrote to the Governor, saying:
 

 “To His Excellency Leche Governor of Louisiana.
 

 “Dear Sir:
 

 “Regarding the verdict given April, I respectfully ask you to change the verdict from life to death, 'by hanging.- I was-, unable to be represented by consel, having been kept in the Mental disease Hospital. I needed a lawyer to represent me, as it was, the money was used entirely by consel for consel for defense. Every bit of that evidence was circumstantial and no one there to protect me. I had 5 thousand dollars to help me but this Layer Burton took entire charge of all the money. I had been guilty of no wrong at all, people got up and said things that needed contradiction. Books that came into my house in 1919 but written in 1904
 
 *593
 
 was used as evidenced Please give me life by hanging.
 

 “Respectfully
 

 “Kate Elfa Tyler”
 

 It is true, as argued by counsel, that this alone is not sufficient to show that she was insane when she wrote the will on January 27. But the testimony as a whole shows to our entire satisfaction that she was insane prior to that date. According to the testimony, she had always been peculiar, was utterly unable to take care of her physical needs, and her mother had looked after her as a child. Her mother had to look after such details as drawing bath water for her and preparing her food. After her mother died, she realized her helplessness, and we are satisfied from the testimony that that realization, the brooding over her mother’s death, and her feeling of utter loneliness overthrew her. reason completely; and we are satisfied that she did not thereafter have lucid intervals in the true legal sense.
 

 It is true that the testimony of Mrs. Burton and Miss Louque, who were in the office at the time the will was written, indicates that Mrs. Tyler was then calm and was undergoing a period of tranquillity, or a cessation of the symptoms of the disorder with which she was afflicted. But there is nothing to show a restoration of her mental faculties sufficient to enable her to judge her acts deliberately.
 

 A lucid interval has been defined as “such a full return of the mind to sanity as places the party in possession of-the powers of his mind enabling him to understand and transact his affairs as usual”. American Digest, Century Edition, Vol. 27, Insane Persons, § 3, page 2458.
 

 In the case of Aubert v. Aubert, 6 La.Ann. 104, 108, the court said:
 

 “A lucid interval, under the civil law, is not an apparent tranquility or a seeming repose. It is not a simple diminution or a remission of the disease, but a temporary cure: an intermission so clearly marked that it perfectly resembles the return of health; and as the nature of the interval cannot be ascertained in an instant, it must continue during a length of time sufficient to give the certainty of the temporary restoration of reason.”
 

 This definition was approved, in the following cases: Godden v. Executors of Burke, 35 La.Ann. 160, 173; Succession of Bey, 46 La.Ann. 773, 787, 15 So. 297, 24 L.R.A. 577; Succession of Morere, 114 La. 506, 513, 38 So. 435.
 

 The will itself indicates that the testatrix was not capable of clear thinking. The fact that she directed her executrix to sell all her property “and to expend the whole amount received therefrom”, after paying her debts, “in an adequate memorial on cemetery plot” is not strange or peculiar in view of the fact that she had neither ascendants nor descendants and had not always been on friendly terms with her collateral relations. But she directed that the “tombstone to be preserved
 
 and used in some way”.
 
 (Italics ours.) It is hard to imagine what she meant by saying she wanted the tombstone “used in some way”.
 

 
 *595
 
 In the will as originally written and signed, she directed that the entire proceeds of her property be expended for an adequate memorial. She later added the following:
 

 “Mrs. Burton, I want a thousand dollar casket and so much invested for upkeep and flowers put on tomb on ‘All Saints Day’.”
 

 She did not sign this addendum, and it did not form part of the will, but she evidently intended that it should. Whether she meant that she wanted an additional sum of $1,000 invested for the upkeep of the tomb and for flowers is not at all clear.
 

 For the reasons assigned, the judgment appealed from, annulling the will, is affirmed.