v. Breaux, 212 La. 459, 32 So.2d 845; Nash v. Curette, 218 La. 789, 51 So.2d 71.

For the reasons assigned, this case is ordered transferred to the Court of Appeal, Second Circuit, provided that the record shall be filed in that court within 30 days from the date on which this decree shall become final; otherwise the appeal shall be dismissed. The appellants are to pay the costs of this appeal to the Supreme Court; all other costs shall await the final disposition of the case.

53 So.2d 834

**Succession of SCHMIDT.**

No. 40009.

May 28, 1951.

Rehearing Denied June 29, 1951.

F. Irvin Dymond, George M. Ponder, New Orleans, for appellants.

Edward Rightor, Walter M. Barnett, Jr., Harry B. Kelleher, George B. Matthews, Charles Cabibi, New Orleans, for appellees.

HAWTHORNE, Justice.

Three collateral relatives of Mrs. Louise May Schmidt, widow of Walter H. Hoffman, instituted this suit seeking to have declared null and void the last will and testament, in olographic form, of Mrs. Hoffman on the ground that the testatrix was not of sound mind at the time the will was written. From a judgment dismissing their suit they have appealed to this court.

On August 23, 1936, the testatrix, a resident of the City of New Orleans, was admitted to Touro Infirmary suffering from pyelonephritis, an infection of the kidneys. She remained in Touro for treatment until November 5, 1936. On that date she returned to her home on State Street and stayed there until December 11, 1936, a little over a month, when she was again hospitalized in Touro Infirmary. From Touro she was sent directly to De Paul Sanitarium on February 20, 1937. The will under attack, dated November 30, 1936, was written during the period she was at her home. While she was in De Paul Sanitarium, she was interdicted by a judgment of court, and this interdiction remained in full force and effect until her death. She left De Paul Sanitarium

and went to California, where she died in 1947, almost 10 years later. The testatrix was in her 70's when she died.

Prior to the time she contracted the kidney infection she had been a normal person mentally, but the opponents contend that subsequently and for a period of at least several months she was habitually insane, so that the will made during that time was invalid.

■ Testamentary capacity is always presumed until the contrary is affirmatively established by satisfactory and convincing evidence, and under this well established principle of law a legal presumption exists in favor of the validity of the will. Kingsbury v. Whitaker, 32 La.Ann. 1055; Chandler v. Barrett, 21 La.Ann. 58; Succession of Mithoff, 168 La. 624, 122 So. 886; Clanton v. Shattuck, 211 La. 750, 30 So.2d 823; Succession of Pizzati, 218 La. 549, 50 So.2d 189.

■ In Succession of Mithoff, supra, this court, in discussing the degree of proof to overcome the presumption of sanity, had this to say: "Testamentary capacity is always presumed. In other words, every person is considered under the law to be of sound mind, and this presumption continues until destroyed by cogent, satisfactory, and convincing evidence. The degree of proof required to overcome the presumption of sanity and of mental disposing capacity may be likened to that required in criminal cases to rebut and overcome the presumption of innocence which the law creates in favor of a person on trial for a crime. This is, we think, a settled rule of which there can be no doubt."

Appellants concede that this principle of law, that a person is presumed to be sane, is correct, but contend that in the instant case they have overcome this presumption by establishing that the deceased testatrix was habitually insane before, at the time of, and after the making of the will which they seek to have declared invalid; that, her habitual insanity having been established, there then arises the presumption that she was incapable of having a lucid interval, and that this presumption has not been overcome by the proponents of the will. In support of this contention they cite the cases of Artigue v. Artigue, 210 La. 208, 26 So.2d 699, and Clanton v. Shattuck, supra. In those cases this court said that there were two classes of insane persons recognized, that is, furiosus and mente captus, and that those in the latter class are habitually insane and are presumed to be incapable of having a lucid interval.[1]

1. The cases of Aubert v. Aubert, 6 La. Ann. 104, and Chandler v. Barrett, 21 La.Ann. 58, are authority for the rule that the presumption is that the habitually insane or those of the mente captus class are incapable of having a lucid interval. The Aubert case indicates that the habitually insane could never have a lucid interval, and the Chandler case is to the effect that the presumption of insanity in the case of the habitually insane is not affected by the fact that the will is sage and judicious. However, in Succession of Morère, 114 La. 506, 38

The first question presented, then, is whether the appellants have overcome the presumption of sanity and have affirmatively established by cogent, satisfactory, and convincing evidence that the deceased testatrix was habitually insane, because, if they have failed to establish habitual insanity, the presumption that she was incapable of having a lucid interval, as announced in the Artigue and the Shattuck cases, supra, does not arise.

According to the medical evidence, the testatrix while a patient at Touro Infirmary was suffering from pyelonephritis, a kidney infection. Pyelonephritis often produces toxemia, and the toxemia in turn produces a mental state which is referred to as toxic psychosis. The disease is often accompanied by fever and periods of irrationality, and one of the characteristics of this type of infection is that the patient has what the doctors term to be periods of exacerbation and remission, which are periods of irrationality and lucidity as the fever or toxemia increases or decreases.

Opponents offer the testimony of five witnesses in support of their contention that the deceased was habitually insane.

A specialist in the field of urology testified that he treated the testatrix during the entire time she was in Touro Infirmary and during this period visited Mrs. Hoffman 20 or 25 times, and that never once did he see her in a condition which he considered rational. This witness, however, admitted on cross-examination that the irrationality could have been due to the toxicity caused by the pyelonephritis, and that it was possible for the patient to return to a rational condition when the toxicity cleared up. He further stated that he was only secondarily involved in the case and did not see the patient regularly, nor did he visit her during the time she was at her home between her two periods of hospitalization, when the will was written.

Two nieces of Mrs. Hoffman and a neighbor, who visited the deceased at the hospital and also at her home, and her stepdaughter, with whom she lived, stated that

So. 435, 438, this court pointed out that the case of Kingsbury v. Whitaker, 32 La.Ann. 1055, modified the rule in those cases to the extent that "even in cases of habitual insanity, if the will, upon its face, appears to be sage and judicious, containing nothing sounding in folly, and it 'is established to have been made by the testator himself, unaided by others, the onus of proving the insanity of the testator at the time of the making still rests upon those who allege it.' * * * " The rule as modified in Kingsbury v. Whitaker, supra, in no way conflicts with what this court said in Artigue v.

Artigue, 210 La. 208, 26 So.2d 699, and Clanton v. Shattuck, 211 La. 750, 30 So. 2d 823, for, when the will is established to have been made by the testator himself, unaided by others, and when its provisions are sage and judicious and contain nothing sounding in folly, the presumption that the habitually insane are incapable of having a lucid interval is overcome, and the will is then presumed to have been made in a lucid interval, and there is imposed upon those who attack it the burden of proving insanity at the moment it was made.

during this period Mrs. Hoffman never appeared to them rational, and they gave numerous instances of irrational acts on her part; for example, that she used vile and vulgar language, was sloppy in her dress, requested cigars although she never smoked, hugged and kissed a Negro maid, had a strange habit of ordering huge quantities of beer and sliced turkey which she served to her callers, and, although normally a cultured and socially correct person, quite often ate her food with her hands instead of with a knife and fork. Most of these witnesses, however, admitted on cross-examination that she knew them, knew her numerous relatives who visited her from time to time, called them by name, knew their relationship to her, and carried on rational conversations with her relatives during their visits. One of these witnesses also identified numerous checks written during the month of November by Mrs. Hoffman, which were for the most part made in payment of household expenses and obligations, such as groceries, the gardener's services, and florist and pharmacy bills.

The opponents also rely on certain documentary evidence, the report of the doctors appointed by the court to ascertain her mental condition prior to her interdiction and two letters written by Mrs. Hoffman, one of which was written shortly before she left Touro Infirmary the first time and the other on or about December 2, 1936.

The report of the doctors, after reciting that they have carefully examined Mrs. Hoffman, says that they "* * * find her to have complete social dislocation and complete economic maladjustability by reason of her psychosis from which she has been suffering, from personal knowledge, since November 1936, during which time she has been confined in Touro Infirmary and De Paul Sanitarium, requiring constant attention of physicians and nurses. She *has been deluded* with marked paranoid trends, *at times being hallucinated and abusive*, rather loquacious, coy appearing, querulous and facetious. These modifications of conduct being contrary to her normal reactions. In the opinion of the undersigned she is incapable of managing her own affairs and continued hospitalization in a neuropsychiatric institution is indicated and recommended." (Italics ours.)

This report, dated some five months after the will was written, does not establish that the deceased was habitually insane, for it very plainly states that "She *has been* deluded with paranoid trends, *at times* being hallucinated and abusive". It establishes only that her periods of abnormality had become sufficiently serious to prevent her from managing her affairs capably, and for this reason it was necessary to interdict her. Even if the deceased had been interdicted prior to the writing of the will, however, the interdiction, standing alone, would not ipso facto incapacitate the interdict from making a will, but would only have been evidence of her incapacity, to be considered with all the other evidence.

See Succession of Lanata, 205 La. 915, 18 So.2d 500.

The first letter was evidently written during a period of irrationality. Portions of the second letter are perfectly sensible, while other parts are somewhat silly, and she was possibly not completely rational when she wrote it.

We have examined and given the most careful consideration to all of the evidence offered by appellants, which we have discussed hereinabove, but this evidence must be weighed and considered with all the other evidence in arriving at our conclusion.

The personal physician of Mrs. Hoffman, Dr. Herbert L. Weinberger, who visited her daily while she was a patient at Touro and often twice a week while she was at home between her visits to Touro, testified that most of the time Mrs. Hoffman was irrational and behaved accordingly, but that at times she was rational, talked in intelligible terms, and comprehended things which were said to her. He further testified that this condition was characteristic of psychosis induced by toxemia resulting from pyelonephritis. He stated that, when Mrs. Hoffman was in a toxic state, she was in the most violent toxic state that he had ever witnessed, so that during her rational periods he was surprised at the clarity of her mental processes. He testified that she was transferred from Touro to De Paul Sanitarium because it was thought that she could better be given phychiatric treatment at the latter institution. He further

testified that he visited her in California in 1939, and that at that time she carried on an intelligent conversation, was completely oriented, and apparently was free of the kidney infection.

On November 15, 1936, at her request the attorney for Mrs. Hoffman visited her in her home and delivered to her a will which she had previously written and which was in his possession. She told the attorney at that time that she desired to make another will in favor of certain individuals, and informed him whom she wanted to favor and asked whether he would make the will. The attorney told Mrs. Hoffman that he would take notes and send her a form to be used in making the new will. He prepared such a form, but it was never delivered because Mrs. Hoffman's nurse called him on November 21 and told him that Mrs. Hoffman said she did not need the form. During the attorney's visit Mrs. Hoffman talked intelligently about various members of her family and of his.

Other relatives and friends who visited her during this period testified that she was rational when they saw her.

Shortly prior to Mrs. Hoffman's interdiction, she delivered to her attorney a memorandum of instructions. This document discloses the remarkable clarity of the testatrix' memory for previous business transactions and her detailed knowledge of the nature and kind of the property which she owned, and contains clear and explicit instructions as to the handling of her various

business affairs during her interdiction. In this document she states, among other things, that she wanted the Whitney National Bank as her curator; that an inventory of the contents of her bank box was to be taken and that she was to be furnished a copy of it; that the bank was to pay all outstanding bills, and that, if there were not sufficient funds on hand, it was to dispose of certain bonds; that a certain individual whom she named had a sum of money which he had used to speculate for her, and that he had for her account a certain sum realized therefrom, which she desired him to place in her checking account. She further states that she wanted all her stocks and bonds registered, and in the settlement of her husband's estate she wanted as her part certain stocks and bonds. This document contains numerous other similar requests and instructions which it is not necessary for us to comment on or discuss. There can be no doubt that at the time this document was written Mrs. Hoffman was perfectly rational.

■■ After thus reviewing all the evidence in the case we have come to the conclusion that the opponents have failed to establish affirmatively that the deceased was habitually insane. Due to the nature of the disease from which the testatrix was suffering, this case does not even present for our consideration one of insanity properly so called, for the derangement of the testatrix was one of those recognized in Article 1789 of our Code, which reads as follows: "A temporary derangement of intellect, whether arising from disease, accident or other cause, also creates an incapacity pending its duration, provided the situation of the party and his incapacity were apparent."

■ The derangement which Mrs. Hoffman had was by its nature temporary because it arose from disease, and was one which admitted of rational periods, and it is established by the evidence that she did have rational periods during the course of the disease; therefore the presumption is that the will was written during one of her lucid, rational periods. This presumption places upon the opponents the burden of proving that she was irrational at the moment the will was confected, and we are of the opinion that they have not established that at that moment she was not of sufficiently sound mind to understand fully the nature of the testamentary act and to appreciate its effect.

■ The will itself is the best answer to appellants' contention that the testatrix did not possess testamentary capacity at the time it was written. It is in olographic form and contains numerous bequests of different amounts in cash to each of certain collateral relatives and friends amounting to a total of approximately $85,000. It also makes bequests of certain items of jewelry owned by the testatrix to various individuals, and provides for the creation of a trust for the benefit of a nephew. This will revokes all other wills written by the testa-

trix, appoints the Whitney National Bank as her executor, and names her attorney. The will is sensible, and its sage and judicious provisions and expressions refute appellants' contention that at the moment it was written the testatrix was of unsound mind and did not · possess testamentary capacity.

The following quotation from Kingsbury v. Whitaker, supra, is pertinent here: " * * * Sanity, or soundness of mind, being the natural condition of man, insanity is never to be presumed, but must be affirmatively and contradictorily established. This rule, which is founded on reason and common sense, is sanctioned by the jurisprudence of England, France and our own country, and has been consecrated by the most distinguished authors on this subject. This wholesome rule has a peculiar application in a case like this, *when the will, written by the testator himself, presents a series of wise and judicious dispositions, contains no contradictions, no extravagance, not a sentence, not a word indicating that it was the offspring of a 'mind diseased', and it throws upon the heirs attacking the will the burden of proof of the unsoundness of mind of the testator at the date of the testament. * * *"* (Italics ours.)

The will in the instant case meets every test laid down in the above quotation.

Bowditch, the testator in the Whitaker case, supra, was subject to delirium tremens, manifested by paroxysms of rage and violence bordering on madness and producing temporary or intermittent insanity. Among the things relied upon by the opponents of the will to establish that he was insane when he wrote the will was his mania for picking from the streets cigar stubs, rags, garbage, and other stuff and storing them in his room as valuable. On three occasions he was confined to different insane asylums. On the very day the will was written interdiction proceedings were instituted against him, and he was subsequently interdicted.

To establish the insanity of Christina Chandler, the testatrix whose will was under attack in the case of Chandler v. Barrett, supra, the opponents of the will relied principally upon delusions or acts of folly committed by her, such as her running on the roof of her house as if trying to escape from an imaginary robber; her delusion that her brother had killed seven men, cut them up, and thrown them in a well; the burning of all her clothes and bedclothing; her belief that her son and a young lady had bought a large kettle for the purpose of boiling her in it, etc.

The acts and delusions of Bowditch and of Mrs. Chandler were much more insane than those of Mrs. Hoffman in the instant case. Yet in each of those cases this court decreed the will to be valid as having been written in a rational or lucid interval, the principal reason in each case being that the will itself was sane, judicious, and rational, and that there was nothing therein

sounding in folly or indicating that it was the instrument of a diseased mind.

Other cases in the jurisprudence reveal also that, although the testator at times committed acts which varied extremely from the normal, this court has been most reluctant to hold that such acts proved insanity at the moment his will was executed.

The second letter introduced in evidence by the opponents, although undated, was in an envelope postmarked December 2, 1936, two days after the date of the will, and, as stated hereinabove, some parts of it are rational and some parts sound rather peculiar, so that it is evidence that she was probably not completely in a normal state when she wrote it. This letter, of course, does not prove that she was in an abnormal state two days previously. Moreover, on December 1, according to the testimony of a niece, Miss Marguerite Donovan, the testatrix was rational when she visited with her. She testified that she remembered the date because Mrs. Hoffman asked for her checkbook so that she could send her sister Florence her check for the month, and she sat up in bed and wrote the check. Mrs. Hoffman realized where she was, recognized and knew Miss Donovan, and inquired about relatives and friends.

We conclude that the appellants have not proved that the testatrix was irrational so that she lacked testamentary capacity at the moment the will was written.

For the reasons assigned, the judgment appealed from is affirmed; appellants to pay all costs.

PONDER, J., recused.

LE BLANC, J., takes no part.