LINDSAY, Judge.
This suit arises from a dispute over the validity of two wills allegedly written by the decedent, Evard Merle Sturgis.
After the death by suicide of the decedent on March 4, 1986, an olographic will dated December 5,1985, was discovered in his safety deposit box at the Oil City Branch of the First National Bank of Shreveport. This will (“the first will”) named as legatee “the Baptist Church Mooringsport Louisiana” and appointed “the pastor of the Mooringsport Baptist Church” as executor. This will was duly admitted to probate. In April, 1986, the decedent’s sister, Tessie Sturgis Plummer, filed suit to set aside the will and have the succession declared intestate. However, about three months later, in July, 1986, a second olographic will was discovered (“the second will”). This will, dated December 24, 1985, named as legatees Mrs. Plummer and one of her daughters, Ramona Amia Trice Kruithof. The daughter petitioned for annulment of the first will, and the probate of the second one.
A bifurcated trial was held in the district court. In the first portion of the trial, the *1295 validity of the second will was at issue. The trial court found it to be a forgery, and rejected the demands of Mrs. Plummer and Mrs. Kruithof. In the second portion, the court found the first will to be valid. Judgment was rendered in favor of the Moor-ingsport Baptist Church and the executor of the estate, the Reverand Harrell F. Sheldon, Sr.
Mrs. Plummer filed a devolutive appeal. She alleges five assignments of error. They are: (1) that the trial court erred in denying a motion for continuance prior to the second portion of the trial when Mrs. Plummer was unable to appear in court allegedly for medical reasons; (2) that the trial court erred in finding that the second will was a forgery and therefore invalid; (3) that the trial court erred in failing to declare that the testator lacked testamentary capacity in making the first will; (4) that the trial court erred in failing to declare the first will invalid because of an uncertain date; and (5) that the trial court erred in finding that “Baptist Church Mooringsport Louisiana” was a sufficient description to have the Mooringsport Baptist Church recognized as a legatee in the first will.
Finding the assignments of error to be without merit, and for the following reasons, we affirm the judgment of the trial court.
DENIAL OF CONTINUANCE
Mrs. Plummer alleges that the trial court abused its discretion in denying her motion for continuance at the beginning of the second portion of the bifurcated trial. She maintains that the trial court’s refusal to grant a continuance prevented her from offering additional testimony and denied her attorney the benefit of information which she could provide during the trial.
The trial court denied an oral motion for continuance made on December 1, 1986, and a written motion filed on December 10, 1986. Neither motion set forth any legal grounds for a continuance. Another written motion filed on December 11, 1986, contained a letter from Dr. Jerome S. Snyder in which he said Mrs. Plummer suffered from hypertension, diabetes, nonheal-ing fractures, and bad nerves. On the morning of trial, December 12, 1986, the trial court received a note that Mrs. Plum-mer had fractured her left clavicle.
The trial court denied the motion for continuance. As Mrs. Plummer had already testified fully during the first portion of the trial, the trial court believed any further testimony elicited from her would be merely repetitious. Further, the medical evidence did not satisfy the trial court that she was unable to appear.
A trial judge has wide discretion in acting upon a motion for continuance, and his ruling will not be disturbed on appeal in the absence of a clear showing of abuse of in that discretion. LSA-C.C.P. Art. 1601, 1602; Coast Wholesale Supply Company v. Young, 441 So.2d 368 (La.App. 5th Cir. 1983), writ denied, 443 So.2d 1121 (La. 1984). Under the facts of this case, we find no abuse of discretion by the trial court.
AUTHORSHIP OF THE SECOND WILL
As her second assignment of error, Mrs. Plummer alleges that the trial court erred in finding that the second will was a forgery, and therefore invalid.
The trial court based its decision, in part, on the testimony of Robert G. Foley, a forensic document examiner who was an expert witness who testified on behalf of the Mooringsport Baptist Church. He testified that the second will was a “blatant, obvious forgery,” displaying several of the classic characterizations of a “simulated forgery.” Foley testified that in a simulated forgery, a person uses a model and attempts to copy it, trying to take on the habits of the author’s signature and writing. Characteristics of forgery which he found in the second will included its poor line quality and the unusual breaks or pen lifts in the signature.
Mr. Foley examined exemplars of the decedent’s handwriting made before and *1296 after the date upon which the second will was allegedly written. They contained normal line quality, and totally lacked the rugged nature and angularity which demonstrated the slowness of the writing on the second will. In his presentation to the court, Mr. Foley concentrated on the decedent’s signatures. He said that a person’s signature is more available, but is harder to forge, because the true author concentrates upon it more and tends to “dress it up.” The two signatures on this will were consistent with each other, but inconsistent with all of the other signatures in the exemplars.
Another basis for the trial court’s decision that the second will was a forgery concerned the highly suspicious circumstances under which it was found. On July 17, 1986, a group consisting of Mrs. Plum-mer, her daughter, Sharon Browne, her son-in-law, William Kruithof, Reverand Sheldon, and Sherwood Searcy, a deacon of the church, went to the decedent’s house. Mrs. Plummer and Mr. Kruithof testified they wanted to look for prescriptions to determine which doctors the decedent had seen prior to his death.
While at the home, Mrs. Browne requested that she be allowed to take a framed, family photograph from the house. The photo was in an inexpensive frame on a table in the living room. After a brief consultation with Mr. Searcy, Mrs. Browne’s request was granted by Reve-rand Sheldon since Mrs. Browne was about to return home to Wyoming. Mrs. Browne, without being so requested, removed the photograph from its frame. A single sheet of paper was found in the frame behind the photograph. Examination of the document revealed that it was the second will.
The testimony of the five persons in the decedent’s house that day indicate that Mrs. Plummer and Revorand Sheldon were together almost the entire time, and Mr. Searcy stayed in the den. Mr. Kruithof and Mrs. Browne, relatives of the legatees in the second will, were in different rooms at various times, although Mr. Kruithof spent much of his time in the kitchen and the den. Several of these persons were out of each other’s sight at various times.
The trial court concluded that someone placed the second will in a place where it would be “accidentally discovered” (trial court’s emphasis), and that it was discovered by design.
Mrs. Plummer argues that the trial court erred in its decision. She claims the decedent enjoyed “playing games” or “tricks”' and was prone to hide important documents in peculiar places. Additionally, two expert witnesses testified on her behalf that the second will was written by the decedent, as did several lay witnesses.
In his opinion, the trial judge specifically stated that he was not impressed with the qualifications of Mrs. Plummer’s expert witnesses as to their education, training and experience as questioned document examiners. Norma Lynn Keeland and James Robert Murray are both members of the World Association of Questioned Document Examiners, received training as apprentices, and attended various seminars. Mrs. Keeland did not examine the originals until the morning she testified. Mr. Murray admitted that he was influenced in his evaluation by information supplied by Mrs. Plum-mer as to a tremor from which the decedent suffered.
By comparison, Mr. Foley received two years of primary training at the Georgia State Crime Laboratory, and has attended seminars and schools at the FBI Academy, the Institute of Paper Chemistry, and Georgetown University. He is a member of the American Society of Questioned Document Examiners; the American Academy of Forensic Sciences, Document Section; the Southern Association of Forensic Sciences, Document Section; and the Louisiana Association of Forensic Sciences. Mr. Foley examined the original documents, and said he based his opinion only on the documents before him.
The weight given the testimony of an expert is determined by his qualifications, *1297 his experience in the field and the facts upon which his opinion is based. The trial judge has considerable discretion in accepting or rejecting such testimony, which should not be disturbed absent manifest error. Emond v. Tyler Building and Construction Company, Inc., 438 So.2d 681 (La.App. 2d Cir.1983). In this case, we find no manifest error in the trial court’s evaluation of the expert witnesses.
We further agree with the trial court that an adverse inference may be drawn from the failure of a witness to testify. Howard Chandler of the Arkansas State Police Crime Lab examined the original documents at the request of Mrs. Plum-mer’s attorney, and was physically present at trial. However, he was not called to testify by Mrs. Plummer’s counsel, who arranged for Mr. Chandler to examine the wills. No explanation for his failure to testify was given. Consequently, it is presumed that his testimony would be adverse to Mrs. Plummer. Succession of Lyons, 452 So.2d 1161 (La.1984). As Mrs. Plummer failed to establish her case by a preponderance of other competent testimony, this presumption was not rebutted. Hayes v. Commercial Union Assur. Company, 459 So.2d 1245 (La.App. 1st Cir.1984), writ denied, 462 So.2d 1247 (La.1985).
Additionally, we find no manifest error in the trial court’s evaluation of the circumstances surrounding the discovery of the second will. There were several interested parties at the decedent’s home when the opportunity to hide the second will was presented. Also, it was Mr. Kruithof, whose wife was a legatee in the mysteriously discovered second will, who supplied the testimony that the decedent hid documents.
Factual conclusions and assessments of credibility by the trier of fact are entitled to great weight. The trial court is in a much better position to evaluate the credibility and veracity of witnesses, and its conclusion regarding credibility should not be disturbed absent clear abuse. Succession of Jones v. Jones, 486 So.2d 1124 (La.App. 2d Cir.1985), writ denied 489 So.2d 249 (La.1986).
This assignment of error has no merit.
TESTAMENTARY CAPACITY
Mrs. Plummer claims that the trial court erred in failing to find the decedent incompetent to execute the first will.
In Louisiana there is a strong presumption in favor of testamentary capacity. The burden of proving lack of testamentary capacity is upon the person alleging it. As the Louisiana Supreme Court stated in Succession of Lyons, supra:
The capacity to make a will is tested at the time the will is made. LSA-C.C. art. 1472. To make a donation mortis causa, a person must be of sound mind. LSA-C.C. art. 1475. The question is whether the testator understood the nature of the testamentary act and appreciated its effects. Succession of Moody, 227 La. 609, 80 So.2d 93 (1955). The burden of proving lack of testamentary capacity is upon the party alleging it. Succession of Schmidt, 219 La. 675, 53 So.2d 834 (1951); Succession of Riggio, [405 So.2d 513 (La.1981)], supra.
In Lyons, the court went on to hold that the opponents of a will must prove by clear and convincing evidence that the testator lacked testamentary capacity at the time the will was made.
In the instant case, although there was testimony that the decedent drank heavily, much of this testimony came from interested parties or their close relatives. On the other hand, the record contains a considerable amount of impartial evidence to the contrary.
In October, 1985, the decedent was admitted to South Park Hospital with an admitting diagnosis of malaise and hypertension. After a two-day stay, he was discharged with a diagnosis of hypertension, tremor, and abnormal liver function tests. The notes of Dr. James W. Thompson indicate that the decedent “vigorously” denied excessive drinking. The decedent’s liver *1298 function test abnormalities were “of uncertain cause.” Dr. Winston Brown testified that he thought the decedent had a benign essential tremor, which caused his head and torso to shake. While the decedent said he did not drink very much, he told Dr. Brown that alcohol lessened the tremors to some degree.
Two of the decedent’s relatives who had no interest in the outcome of the suit testified that they saw the decedent frequently. Sherri Groll, a cousin, and Henry Groll, her husband, testified that the decedent never drank in their presence. Mrs. Groll said that she only saw the decedent intoxicated once, which was in November, 1985. They were aware that the decedent began drinking after his mother’s death in 1984. Mr. Groll described the decedent as an emotional, nervous type of person who had been devoted to his mother. The decedent had also been bitterly estranged from his sister over a dispute concerning their mother’s estate.
The testimony of the Grolls differed substantially from that of the Kruithofs. In particular, Mr. Kruithof depicted the decedent as being constantly drunk. He said, “I really never seen him what I would consider completely sober.”
Another relative, Mrs. Browne, stated in her deposition that she saw her uncle on the night of December 5,1985. She said he was trembling, did not make sense, and smelled of alcohol. However, Mrs. Browne also said that she did not know the decedent had a condition which caused him to shake. We note that Mrs. Browne is the daughter of Mrs. Plummer, and that she was present in the decedent’s house when the second will mysteriously appeared. Both of these facts cause her testimony in this regard to be viewed with caution.
Given the testimony and the consideration which we give to the trial judge’s evaluation of the witnesses and their credibility, we are unable to say that the trial court erred in holding that Mrs. Plummer failed to prove by clear and convincing evidence that the decedent lacked testamentary capacity.
This assignment of error has no merit.
UNCERTAIN DATE
The first will is dated December 5, 1985, and was found in the decedent’s safety deposit box. According to the bank’s signature record, the last time the decedent entered the safety deposit box was on October 31, 1985. Thus, Mrs. Plummer claims that it is impossible that the decedent wrote the first will on December 5, 1985. She argues that these facts make the date of the will uncertain, making the will itself invalid.
However, the date of the will is not uncertain. The date was clearly written in the hand of the testator. Although the bank’s records do not show an entry into the safety deposit box after October 31, 1985, they likewise do not exclude the possibility of entry.
Bank officials testified that admittance to the safety deposit boxes is regulated by bank employees, not automation. It is the duty of the bank employees, all of whom have the ability to admit customers to their boxes, to have the card signed.
The church argues that human error, through an omission by a bank employee, was responsible for the lack of the decedent’s signature on the bank's record showing entry. The trial court apparently accepted this explanation and in light of all the evidence in this case, we do not feel that manifest error occurred.
In view of the testimony that the will was entirely written, dated and signed by the testator, the date is certain. After considering the validity of the will, and the vulnerability of the bank’s system to mistakes, we cannot agree that the date of the will was uncertain.
This assignment is without merit.
AMBIGUITY OF THE NAMED LEGATEE
Appellant argues that decedent's designation of “Baptist Church Moorings-port Louisiana,” as legatee, was not a sufficient description of the Mooringsport Bap *1299 tist Church. She notes that there are at least two other Baptist churches in the Mooringsport area.
Article 1714 of the Civil Code states:
In case of ambiguity or obscurity in the description of the legatee, as, for instance, when a legacy is bequeathed to one of two individuals bearing the same name, the inquiry shall be which of the two was upon terms of the most intimate intercourse or connection with the testator, and to him shall the legacy be decreed.
Mr. Searcy testified that he saw the decedent at the Mooringsport Baptist Church on at least one occasion. At the time of his death, the decedent had on his person two checks made payable to the Mooringsport Baptist Church. Finally, in the third paragraph of the first will, the decedent appoints the pastor of “the Mooringsport Baptist Church” as executor.
The record clearly shows that the Moor-ingsport Baptist Church was the proper legatee.
CONCLUSION
Accordingly, the judgment of the district court is affirmed, at appellant’s cost.
AFFIRMED.