NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-1421 consolidated with 11-1422, 11-1423

SUCCESSION OF CLABY PIERRE CHIASSON

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. P-20020706 C/W P-20070155, C-20083836
HONORABLE ARTHUR J. PLANCHARD, DISTRICT JUDGE PRO TEMPORE

**********

JIMMIE C. PETERS
JUDGE

**********

Court composed of Oswald A. Decuir, Jimmie C. Peters, and J. David Painter, Judges.

REVERSED IN PART; AFFIRMED IN PART;
RENDERED; AND REMANDED.

Bruce A. Gaudin
Attorney at  Law
100 W. Bellevue St.
Opelousas, LA 70570
(337) 948-3818
COUNSEL FOR PLAINTIFF/APPELLANT:
     Faye Dekerlegand Chiasson

Kaliste J. Saloom, III
Saloom & Saloom
Post Office Drawer 2999
Lafayette, LA 70502-2999
(337) 234-0111
COUNSEL FOR DEFENDANTS/APPELLEES:
    Anne Comeaux Chiasson
    Jessie P. Chiasson
    Delores Chiasson Broussard
    JimmieBroussard

PETERS, J.

This fact intensive appeal stems from three consolidated matters: two successions and a petition for declaratory judgment. The plaintiff in the declaratory judgment action, Faye Dekerlegand Chiasson (Faye), appeals the trial court judgment rejecting a number of her claims to ownership of the property at issue in this litigation. For the following reasons, we reverse in part, affirm in part, render judgment, and remand for further proceedings.

## DISCUSSION OF THE RECORD

This litigation involves the dispute over the property belonging to the community of acquets and gains previously existing between Claby Pierre Chiasson and Anne Comeaux Chiasson (Claby and Anne). Three children were born to the marriage of Claby and Anne: Jessie P. Chiasson, Dolores Chiasson Broussard, and Wilson J. Chiasson. Claby died on March 27, 1988, and his succession is one of the consolidated matters in this litigation. Anne died on January 7, 2007, and her succession is also one of the three consolidated matters. Faye is Wilson's surviving spouse; he died on July 8, 2006, and she is the petitioner in the petition for declaratory judgment—the third of the consolidated cases. The following represents the chronology of the events directly and indirectly affecting this litigation.

During their marriage, Claby and Anne resided in their community-owned property at 121 Eucharist Road in Lafayette, Louisiana. While the litigation does involve ownership of movable property belonging to their estates, the primary dispute is over the ownership of their community home place.

The events giving rise to this protracted litigation began soon after Claby's death on March 27, 1988. He died intestate, and, initially, no one instituted judicial proceedings to have the appropriate heirs recognized. Instead, the first

instance of ownership recognition by any of the heirs came in the form of a $10,000.00 collateral mortgage and note executed by Wilson in favor of his brother-in-law and Dolores' husband, Jimmy Broussard. Wilson used his yet unrecognized inherited interest in the 121 Eucharist Road property as collateral. Although the collateral mortgage and note were executed on September 19, 1990, the collateral mortgage was not recorded in the Lafayette Parish mortgage records until February 9, 1998.

Slightly less than five years later, on July 17, 1995, Wilson executed an authentic act wherein he asserted that he sold his interest in the 121 Eucharist Road property to Jessie for $5,000.00. The authentic act did not describe the immovable property being transferred by metes and bounds. Instead, the parties simply described it as being located at 121 Eucharist Road. Additionally, it not only failed to mention the yet-to-be recorded collateral mortgage executed in favor of Jimmy Broussard, but it stated that the property was free and clear of any and all mortgages and liens. This authentic act was not recorded in the Lafayette Parish conveyance records until February 6, 1998, or three days before the recordation of the collateral mortgage.

On March 11, 1998, Anne executed the first of three last wills and testaments she was to sign. In this first will, she provided that her estate would be divided equally between her three children at the time of her death. The testament also contained a clause reducing the value of Wilson's share by the amount he might owe Jessie and/or Dolores at Anne's death. Ten days later, Anne executed a general power of attorney in favor of Jessie.

2

Anne executed a second last will and testament on March 25, 2002. In that will, Anne disinherited Jessie and Dolores and left all of her property remaining at the time of her death to Wilson.

Slightly more than seven months later, on November 13, 2002, Wilson filed pleadings to open his father's succession and have himself appointed as administrator of the succession. He did so without informing his mother or his siblings of his action and, after obtaining letters of administration, he filed pleadings as administrator seeking authorization from the court to sell his father's interest in the 121 Eucharist Road property to him and his wife for $5,000.00. On January 31, 2003, Wilson received the authorization from the trial court, and, on February 5, 2003, he executed, in his capacity as administrator, an act of cash sale transferring the property to him and Faye. The act of cash sale made no mention of the previous sale to Jessie.

Assuming this and the sale to his brother to be valid acts, the ownership of the property at 121 Eucharist Road would have been as follows:

| | |
|---|---|
| Anne | undivided one-half interest |
| Jessie | undivided one-sixth |
| Wilson and Faye | undivided one-third interest |

The ownership of the remainder of the property belonging to the community's estate would have been as follows:

| | |
|---|---|
| Anne | undivided one-half interest |
| Jessie | undivided one-sixth interest |
| Delores | undivided one-sixth interest |
| Wilson | undivided one-sixth interest |

At some point, Wilson's mother and siblings became aware of his actions in transferring his father's share of the property and, on April 19, 2004, they responded by filing a petition seeking, among other relief, to have him removed as the administrator of Claby's succession, to test his administrative bond, to annul

3

the February 5, 2003 sale of the succession property, to obtain a full accounting and conclude the succession, and to recover damages from Wilson for breach of his administrative duty. Wilson responded with an exception of res judicata.

A few days after she had joined with Jessie and Dolores in the April 18, 2004 proceeding to have Wilson removed as administrator and to have his actions as administrator set aside, Anne executed a second power of attorney. In this April 27, 2004 document, she appointed Wilson and Faye to act as her attorneys in fact. One month and one day later, on May 28, 2004, she designated Wilson and Faye as beneficiaries on her life insurance policy. Less than one week later, on June 3, 2004, Anne executed a third and final last will and testament. In this will, which is the primary subject of this litigation, she disinherited all of her children and left all of her property remaining at the time of her death to Faye.

While Anne was executing these instruments favorable to Wilson and Faye, the litigation she and her other two children initiated continued to move forward. In a July 16, 2004 hearing, Anne and her children reached a settlement of the issues associated with Claby's succession. The oral stipulation presented to the trial court provided, among other things, that Wilson would no longer be administrator and that he would be "ordered to return all of the property of the Estate subject to the sale in his possession," at his costs. The parties agreed that a judgment memorializing the stipulation would be presented to the trial court for signature. However, the record contains no judgment finalizing this stipulation.

The effect of this July 16, 2004 stipulation would seem to have been to place all of the heirs in the same ownership status they held immediately after Claby's death. However, we note that although the administrative sale of the immovable

4

property was to Wilson and Faye, Faye was not joined as a defendant in the effort to set the sale aside.

The next event to add to the continuing family dispute came on February 17, 2005, when Anne executed another power of attorney appointing Jessie and Dolores as her attorneys in fact. The power of attorney specifically granted Jessie and Dolores the power to exercise any rights Anne might have with respect to her life insurance policy. Four days later, and acting on this authority, Jessie and Delores changed the beneficiary designation of Anne's life insurance policy from Wilson and Faye to themselves and Wilson.

On May 18, 2006, at the request of Anne, Jessie, and Dolores, the trial court signed a judgment of possession in Claby's succession recognizing Anne as Claby's surviving spouse and the owner of an undivided one-half of the community estate and as having a usufruct over the remaining one-half; and recognizing the three children as the sole heirs of their father and, as such, the owners in equal portions of the property belonging to their father's estate. The immovable property located at 121 Eucharist Road was specifically described by metes and bounds as a community asset. No mention was made of the transfer from Wilson to Jessie.

Three months to the day later, on August 18, 2006, Wilson died. Less than five months later, on January 7, 2007, Anne died. On March 22, 2007, Faye filed a petition to probate Anne's June 3, 2004 will. After qualifying as testamentary executrix, Faye filed a petition to dispense with the administration of the succession and to be placed in possession of all the property belonging to Anne's estate. On May 12, 2008, the trial court executed a judgment of possession

5

recognizing Faye as the owner of all the property belonging to Anne's estate, including Anne's one-half interest in the 121 Eucharist Road property.

Sometime after Wilson's death, succession proceedings were opened in the Fifteenth Judicial District, Lafayette Parish, for the distribution of his estate. On April 28, 2008, that court executed a judgment of possession recognizing Faye as Wilson's sole legatee and placing her in possession of all the property belonging to the community of acquets and gains previously existing between her and Wilson. One of the properties listed was an undivided one-half interest in the 121 Eucharist Road property.

On July 3, 2008, or less than two months after she obtained the judgment of possession in Anne's estate, Faye filed a petition for declaratory judgment seeking to be declared the owner of all the 121 Eucharist Road property. She claimed full ownership by virtue of her deceased husband's transfer of Claby's one-half interest through the administration of that succession combined with her acquisition of Anne's share through Anne's succession proceedings. Faye named Jessie, Dolores, and Dolores' husband, Jimmie Broussard, as defendants.

Six days later, on July 9, 2008, Jessie and Dolores filed a petition seeking to intervene in Anne's succession despite the fact that a judgment of possession had already been rendered. In their intervention petition, they sought annulment of the June 3, 2004 will and to have the March 11, 1998 will probated instead. The trial court consolidated the two succession proceedings and the petition for declaratory judgment by an order dated November 15, 2009. Faye then supplemented her declaratory judgment action by asserting that she was also the owner of the contents of the home located on the 121 Eucharist Road property and was entitled to a judgment against Jessie and Dolores for the rental income they collected from

Wilson's son when he resided in the property and for rent from Jessie for the time he resided there. She also asserted that she was entitled to the proceeds of a life insurance policy which was collected by Jessie and Dolores as the beneficiaries of Anne's policy.

Following a two-day trial on the merits, which began on February 15, 2011, the trial court took the matter under advisement. On April 14, 2011, the trial court filed written reasons for judgment wherein it concluded that Anne's June 3, 2004 will was invalid; rejected Faye's request for a declaratory judgment in her favor; ordered the 1990 collateral mortgage cancelled; declared the July 17, 1995 sale by Wilson to Jessie as valid;[1] recognized the July 16, 2004 stipulation setting aside the February 5, 2003 sale of the succession property; denied Faye's request that she be declared the owner of the movables inside the house located at 121 Eucharist Road property; ordered Jessie and Dolores to pay Faye rent; ordered that Faye's claim for the proceeds of Anne's life insurance police be decided through Anne's succession; and held that Anne's March 11, 1998 will, being in the correct form, could be presented for probate in "the appropriate proceedings." It further held that any claims pertaining to the repairs of home at 121 Eucharist Road by the parties be presented for consideration in Anne's succession. The trial court executed a judgment to this effect on August 29, 2011, and Faye perfected this appeal thereafter.

In her appeal, Faye raises six assignments of error:

1. The trial judge was clearly wrong in allowing evidence that the testament executed by Anne Chiasson on June 3, 2004, was a forgery.

2. The trial judge was clearly wrong in holding that the testament executed by Anne Chiasson on June 3, 2004, was an absolute nullity.

---

[1] In its oral reasons for judgment, the trial court found that the transfer was invalid as to form. However, the trial court reversed this position in its written reasons.

7

3. The trial judge committed reversible error when he ruled that the July 17, 1995 sale from Wilson Chiasson to Jessie Chiasson was valid.

4. The trial judge was clearly wrong when he ruled that the sale by the Estate of Claby Chiasson to Wilson Chiasson and Faye Dekerlegand Chiasson on February 5, 2003, was invalid.

5. Faye Chiasson was entitled to be recognized as owner of movable assets and the trial judge was clearly wrong in denying her claim.

6. The trial judge was in error in not ruling on plaintiff's claim for life insurance benefits paid to Jessie Chiasson and Dolores Chiasson Broussard.

## OPINION

### *Assignments of Error Numbers One and Two*

Through their intervention in Anne's succession proceedings, Jessie and Dolores sought to have the June 3, 2004 will declared invalid based solely on Anne's mental incompetence at the time of its execution. In their answer and reconventional demand, filed in response to Faye's petition for declaratory judgment, Jessie and Delores again asserted only that Anne did not have the mental competence to execute the June 3, 2004 will.

At trial, Jessie and Dolores introduced documents bearing Anne's signature in an effort to prove that the mark on the June 3, 2004 will was not made by her. The trial court overruled Faye's objection to this evidence on the grounds that Dolores and Jessie had not raised the affirmative defense of fraud in their pleadings. Next, Jessie and Dolores Faye offered the testimony of Cynthia Rogers, a board certified document examiner, to address the authenticity of Anne's signature. Faye again objected, adding to the lack of proper pleadings objection the complaint that Ms. Rogers had not been listed as an expert witness on the pre-trial statement filed by Jessie and Dolores and that the authenticity issue had not been raised prior to trial. The trial court rejected Faye's objection and allowed Ms. Rogers to testify.

8

Ms. Rogers' testimony was to the effect that the mark on the will at issue was not that of Anne. The trial court ultimately relied on Ms. Rogers' testimony to conclude that the mark on the June 3, 2004 will was not made by Anne.

After reviewing the record, we agree with Faye that the trial court erred in allowing Jessie and Dolores to introduce any evidence pertaining to the authenticity of Anne's signature. The issue of fraud, which is an affirmative defense, was not raised by Jessie and Dolores in either record addressing the validity of the June 3, 2004 will and, when evidence was offered, Faye timely objected. "A timely objection to an attempt to enlarge the pleadings, coupled with a failure to move for an amendment to the pleadings, is fatal to an issue not raised by the pleadings." *Barham & Arceneaux v. Kozak*, 02-2325, p. 17 (La.App. 1 Cir. 3/12/04), 874 So.2d 228, 242.

Louisiana Code of Civil Procedure Article 1005 provides that "[t]he answer shall set forth affirmatively negligence, or fault of the plaintiff and others, duress, error or mistake, estoppel, extinguishment of the obligation in any manner, failure of consideration, fraud, illegality, injury by fellow servant, and any other matter constituting an affirmative defense." Furthermore, La.Code Civ.P. art. 856 states in part, "In pleading fraud or mistake, the circumstances constituting fraud or mistake shall be alleged with particularity." However, the failure to raise an affirmative defense will not prevent a party from raising it later under certain circumstances. Louisiana Code of Civil Procedure Article 1154 provides:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleading. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues. If evidence is object to at the trial on the ground that it is not within the issues made by the

pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby, and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense on the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

We find that the trial court erred in allowing into evidence any exhibits and testimony pertaining to the issue of fraud. The issue of whether the mark on the June 3, 2004 will was actually Anne's was not raised by Dolores and Jessie as an affirmative defense nor was it put at issue during the testimony of Faye's witnesses. The notary on the will, Dwight Reed, and a witness, Garrett Duplechin, both attorneys, were only questioned as to whether Anne was mentally competent to sign the will. Thus, the question of the authenticity of Anne's signature was never raised. Accordingly, we find that any evidence pertaining to fraud, including the testimony from Ms. Rogers, was improperly admitted into evidence. Based on the foregoing, we must now determine only whether Anne lacked testamentary capacity at the time the June 3, 2004 will was prepared.

The law pertaining to testamentary capacity was laid out by the supreme court in *Succession of Lyons*, 452 So.2d 1161, 1164-66 (La.1984) (alterations ours):

> The capacity to make a will is tested at the time the will is made. LSA-C.C. art. 1472. To make a donation mortis causa, a person must be of sound mind. LSA-C.C. art. 1475. The question is whether the testator understood the nature of the testamentary act and appreciated its effects. *Succession of Moody*, 227 La. 609, 80 So.2d 93 (1955). The burden of proving lack of testamentary capacity is upon the party alleging it. *Succession of Schmidt*, 219 La. 675, 53 So.2d 834 (1951); *Succession of Riggio*, [405 So.2d 513 (La.1981)].

> There is a presumption in favor of testamentary capacity. *Succession of Mithoff*, 168 La. 624, 122 So.2d 886 (1929); *Succession of Lambert*, 185 La. 416, 169 So.2d 453 (1936); and *Succession of Riggio*, supra.

> . . . .

Strong policy considerations are also involved when testamentary capacity is disputed. As the court stated in *Kingsbury v. Whitaker*, [32 La.Ann. 1055, 36 Am.Rep. 278 (1880)]:

> "To wrest a man's property from the person to whom he has given it, and to divert it to others from whom he has desired to withhold it, is a most violent injustice, amounting to nothing less than post-mortem robbery, which no court should sanction, unless thoroughly satisfied . . . that the testatory [sic] was legally incapable of making a will." 32 La.Ann. 1055 at 1062-1063.

These considerations require that a party alleging lack of testamentary capacity overcome the presumption of capacity by clear and convincing evidence.

Mr. Reed, an Opelousas attorney, testified that he drew up the June 3, 2004 will in statutory form for Anne and identified the witnesses to the will as Garrett Duplechin, an attorney in his office, and Stacey Richard. With regard to how the will was executed, he testified that he always follows the same procedure: he oversees the execution of the will in a room with the testator and the two witnesses, and anyone named as a beneficiary is asked to leave the room. Mr. Reed testified that he has the testator sign both at the end of the will and at the end of the attestation clause.

The attestation clause read:

> In our presence the testatrix has declared or signified that this is her last will and testament and that she is able to see and read and knows how to sign her name but is unable to do so because of a physical infirmity; and in our presence she has affixed, or caused to be affixed, her mark or her name at the end of the last will and testament and on each other separate page, and in the presence of the testatrix and each other, we have subscribed our names this third (3rd) day of June, 2004.

Mr. Reed testified that there was no evidence that Anne was mentally incompetent to sign her will. Had he had any concerns in that regard, he would not have allowed her to execute the document. He acknowledged that he had no

independent recollection of the exact infirmity that prevented Anne from signing her name to the will.

Mr. Duplechin also testified at trial and acknowledged that he witnessed Anne execute the June 3, 2004 will. He specifically recalled participating in the will's execution, but did not have any particular recollection of the incident, Anne's physical appearance, any comments she may have made, or whether she appeared to have been subject to any undue influence. He was aware that Stacey Richard, the law firm's long-time secretary and the other witness to the will, was Faye's sister. All he could remember was that it was a very uneventful execution of a will.

Faye testified that on June 3, 2004, Anne asked that she bring her to an attorney because she was concerned that Jessie and Dolores were taking things that did not belong to them. Faye told Anne that she knew Mr. Reed, that her sister worked for him, and that she would take her to the Opelousas office as she wished. Faye testified that once they arrived at the office, Anne and Mr. Reed went into his office and, when Anne exited the office, she had an envelope in her hand. According to Faye, Anne did not tell her that she had actually executed a will until they returned home and Anne handed her the envelope.

Faye testified that in early June 2004, Anne was capable of reading, writing, and signing her name; and that she made her own decisions. According to Faye, Anne's handwriting was shaky and would become worse when she was upset. Faye further asserted that she had been Anne's primary care giver prior to Anne entering the nursing home in 2001.

On the other hand, Jessie testified that his mother was suffering from Parkinson's disease, Alzheimer's disease, and dementia, for which she received

12

treatment from a neurologist.[2] He asserted that from 1998 forward, her memory had gone from bad to worse and that by the early 2000s, he and Dolores had placed her in a nursing home. Jessie did not specifically testify as to Anne's mental capacity as of June 2004, and acknowledged that she had signed the February 17, 2005 power of attorney in favor of him and Dolores and that she had joined him and Dolores in filing the May 18, 2006 petition for possession in Claby's succession. In both instances, he stated that everything was explained to Anne at the attorney's office and that she understood what was she was doing when she signed the documents.

Dolores testified that Anne was in the nursing home from 2002 through her death in 2007. She stated that Anne was initially placed there because she was losing weight and not taking her medications properly. According to Dolores, she had visited Anne soon after she had executed the June 3, 2004 will disinheriting her and Jessie. Apparently the discussion became so confrontational that she and Jessie were asked to leave the nursing home after Anne became upset and started crying. She stated that their mother became upset when they tried to explain to her that she had disinherited them. According to Dolores, Anne started crying and denied that she had done so. Dolores testified that her impression was that Anne did not understand what she had done. However, Dolores also testified that Anne was mentally competent when she signed the February 2005 power of attorney and the 2006 petition for possession.

Based on the foregoing evidence, we find that Dolores and Jessie failed to prove by clear and convincing evidence that Anne was mentally incompetent when

---

[2] Jessie and Dolores introduced no medical evidence to support their position that their mother suffered from any condition that would have rendered her unable to make her own decisions.

13

she executed her June 3, 2004 will. Despite their argument that she was mentally incompetent in 2004, they both testified that she was mentally competent in 2005 and 2006, when she granted them power of attorney over her estate and when she joined with them in filing the petition of possession in Claby's succession. In light of the progressive nature of Parkinson's, Alzheimer's, and dementia, it is more likely that Anne was incompetent in 2005 or 2006, at least more so than she was in 2004. Accordingly, we find that Anne was mentally competent to execute her will on June 3, 2004.

*Assignment of Error Number Three*

Faye next argues that the trial court erred in finding that the July 17, 1995 sale by Wilson to Jessie was a valid transfer of title to Wilson's interest in his father's share of the family home.

Immediately after completion of the evidence at trial, the trial court stated its general position on the pending issues. In its oral statement, the trial court stated that it was of the opinion that the transfer from Wilson to Jessie was invalid partly because it did not include the metes and bounds description of the property and partly because it was a simulated sale. However, in its written reasons for judgment, the trial court reversed its position to conclude that the sale was a valid sale. The trial court noted that the act of sale document was in proper form; that it reflected the consent of the parties; that the use of the municipal address in identifying the property was sufficient to identify the property; and that the act of sale recited the price ($5,000.00). The trial court concluded that the transaction met the requirements of La.Civ.Code art. 2439.

We find merit in Faye's assignment of error on this issue. In fact, we conclude that based on the record before us, the trial court was correct initially in

14

recognizing the July 17, 1995 as a simulation. Louisiana Civil Code Article 2025 provides that "[a] contract is a simulation when, by mutual agreement, it does not express the true intent of the parties."

In this case, the record establishes that the property was already subject to a mortgage held by the brother-in-law of both Jessie and Wilson, although the act of sale states that the property was free and clear of all encumbrances; neither the act of sale nor the mortgage were recorded in the public records until years after their execution. Anne's March 11, 1998 will, which was executed slightly over one month after the recordation of the act of sale and mortgage, divided her property equally between her three children, but required that Wilson's share be reduced by the outstanding amounts he owned his siblings.

The most telling aspect of the litigation surrounding this issue is the fact that Jessie himself has never taken the position that he owns Wilson's share of Claby's succession. In fact, Wilson specifically joined with his mother and sister in the judgment of possession which recognized the three siblings as co-owners of Claby's share of the community estate subject only to Anne's usufruct. The judgment of possession rendered in Claby's succession describes the family home as one of those equally shared assets. This action by Jessie has the effect of a judicial confession. La.Civ.Code art. 1853.

Given our view of the evidentiary record, we find that the trial court erred in concluding that the July 17, 1995 act of sale was a valid transfer of Wilson's interest in his father's succession to his brother, Jessie.

*Assignment of Error Number Four*

In this assignment of error, Faye argues that the trial court erred in concluding that the sale of Claby's interest in the family home through the administrative process was invalid. We find no merit in this assignment of error.

Wilson opened his father's succession without the knowledge of his mother or siblings. While technically notice was not required to the other heirs, once he received the appointment as administrator, he became subject to all the obligations thereof. As administrator, Wilson became a "fiduciary with respect to the succession" and had the obligation to act "as a prudent administrator." La.Code Civ. P. art. 3191. Still, and despite the language of La.Code Civ.P. art. 3194 which provides that an administrator "cannot acquire any property of the succession, or any interest therein, personally or by means of third persons, except as provided in Article 3195," Wilson did fit within the exception set forth in La.Code Civ.P. art. 3195(4), in that he was "[a]n heir or legatee of the deceased," and, therefore, could contract with the succession.

The question of whether Wilson functioned as a proper fiduciary or prudent administrator was rendered moot when he agreed to July 16, 2004 stipulation wherein he agreed to return the property subject to the administrative sale. By this stipulation, the transfer was recognized as invalid. We find no error in the trial court's determination in this regard.[3]

*Assignment of Error Number Five*

In this assignment of error, Faye asserts that the trial court erred in not recognizing her as owner of movable assets belonging to the estates of Claby and

---

[3] We recognize that Faye was not a party to the succession proceedings. With that in mind, we make no comment concerning any other remedies she may have against Wilson's administrative bond.

16

Anne. While we do not find that she is the sole owner of the movable assets, we do find that Faye has an ownership interest in the movable assets.

Based on our analysis set forth hereinabove, the ownership of the property belonging to Claby's one-half interest in the community estate is as follows:

| | |
|---|---|
| Jessie | undivided one-sixth interest |
| Dolores | undivided one-sixth interest |
| Faye | undivided one-sixth interest |

The property belonging to Anne's estate belongs completely to Faye by virtue of the June 3, 2004 will. Thus, she owns an undivided two-thirds interest in the combined estates, including the movable assets.

### *Assignment of Error Number Six*

Finally, Faye complains that the trial court erred in not recognizing her claim to the life insurance benefits paid to Jessie and Dolores in association with Anne's death. We find this assignment has no merit in that Faye failed to prove her right to any proceeds from the insurance policy.

The life insurance policy in question was acquired by Anne through her employment with the Lafayette Parish School Board. On May 28, 2004, Anne executed a "BENEFICIARY DESIGNATION" form wherein she named Wilson and Faye as primary beneficiaries under the policy. On February 21, 2005, Jessie and Dolores, using the power of attorney granted to them by Anne, executed a new "BENEFICIARY DESIGNATION" form wherein they changed the primary beneficiaries to themselves and Wilson.

As previously noted, Wilson died before Anne. The only other documentary evidence concerning the life insurance policy are copies of three checks issued by the insurer:

Check dated April 5, 2007, made payable to Jessie for $4,684.90.
Check dated April 5, 2007, made payable to Dolores for $4,684.90.

17

Check dated April 5, 2007, made payable to Melancon Funeral Homes, Inc., for $3,645.79.[4]

While it is clear that Wilson was one of the named principal beneficiaries under the life insurance policy, the policy itself was not introduced into evidence. Thus, we cannot ascertain what effect Wilson's death had on the beneficiary designation. Faye failed to carry her burden on this issue.

## ISSUE ON REMAND

In its judgment, the trial court deferred all claims for repairs and reimbursements pertaining to the 121 Eucharist Road property to proceedings in the Succession of Anne Comeaux Chiasson. However, based on our finding that Faye owns an undivided two-thirds interest in the combined estates of Claby and Anne, we remand this matter to the trial court for a determination of these claims.

## DISPOSITION

For the foregoing reasons, we reverse the trial court judgment declaring the June 3, 2004 last will and testament executed by Anne Chiasson to be a nullity, and we reinstate the judgment of possession rendered in the proceedings designated as the Succession of Anne Comeaux Chiasson recognizing Faye Dekerlegand Chiasson as the universal legatee and the owner of all of the property belonging to her estate. We reverse the trial court judgment declaring valid the July 17, 1995 transfer by Wilson Chiasson of his interest in the Succession of Claby Pierre Chiasson to his brother, Jessie Chiasson. We affirm the trial court judgment recognizing the July 16, 2004 stipulation declaring invalid the February 5, 2003 sale of the succession property. We reverse the trial court judgment declaring that Faye Dekerlegand Chiasson has no ownership interest in the movable property

---

[4] The payment to the funeral home was made pursuant to an assignment of benefits executed by Jessie and Dolores and dated January 30, 2007.

belonging to the Estates of Claby Pierre Chiasson and Anne Comeaux Chiasson. We affirm the trial court judgment declaring that Faye Dekerlegand Chiasson has no rights in the life insurance benefits on the life of Anne Comeaux Chiasson. Finally, we render judgment declaring that Faye Dekerlegand Chiasson has an undivided two-thirds interest in all the property belonging to the Estates of Claby Pierre Chiasson and Anne Comeaux Chiasson; and that Jessie Chiasson and Dolores Chiasson Broussard are the owners of an undivided one-sixth interest each in the property belonging to those estates. We further remand this matter to the trial court for further proceedings on the issue of repairs and reimbursements pertaining to the 121 Eucharist Road property. We assess one-third of the costs of this appeal to Faye Dekerlegand Chiasson and the remaining two-thirds to Jessie Chiasson, Dolores Chiasson Broussard, and Jimmie Broussard.

**REVERSED IN PART; AFFIRMED IN PART; RENDERED; AND REMANDED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.